Dated: March 16, 2015

Teresa WEIDMAN, Plaintiff

v.

Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.

CIVIL ACTION NO. 3:14-552

United States District Court, M.D. Pennsylvania.

Signed September 30, 2015

Katherine L. Niven, Law Office of Katherine L. Niven & Associates, PC, Harrisburg, PA, for Plaintiff.

G. Michael Thiel, U.S. Attorney's Office, Scranton, PA, for Defendant.

## MEMORANDUM

MALACHY E. MANNION, United States District Judge

Pending before the court is the report of Judge Cohn, the magistrate judge to whom the above matter was referred,[1] (Doc. 18), which recommends that the Court enter judgment in favor of the Commissioner of the Social Security Administration and against Plaintiff Teresa Weidman. More specifically, the report recommends that the Court affirm the Commissioner's final decision denying the plaintiff's application for benefits under the Social Security Act, as the Commissioner's decision was supported by substantial evidence. Based upon the court's review of the record, the court will ADOPT Judge Cohn's Report and Recommendation.

## I. STANDARD OF REVIEW

When objections are timely filed to the report and recommendation of a magistrate judge, the district court must review de novo those portions of the report to which objections are made. 28 U.S.C. § 636(b)(1); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir.2011). Although the standard is de novo, the extent of review is committed to the sound discretion of the district judge, and the court may rely on the recommendations of the magistrate judge to the extent it deems proper. *Rieder v. Apfel*, 115 F.Supp.2d 496, 499 (M.D.Pa.2000) (citing *United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)).

For those sections of the report and recommendation to which no objection is made, the court should, as a matter of good practice, "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b), advisory committee notes; see also *Univac Dental Co. v. Dentsply Intern., Inc.*, 702 F.Supp.2d 465, 469 (M.D.Pa.2010) (citing *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir.1987) (explaining judges should give some review

---

1. Plaintiff's counsel intermittently misidentifies Magistrate Judge Cohn as a "Magistrate" throughout her Objections. (Doc. 19). The title magistrate no longer exists in the U.S. Courts, having been changed from "magistrate" to "magistrate judge" in **1990**. Judicial Improvements Act of 1990, 104 Stat. 5089, Pub.L. No. 101–650, § 321 (1990) ("After the enactment of this Act, each United States magistrate ... shall be known as a United States magistrate judge."). Plaintiff's counsel is reminded to use the correct title, in the future, when referring to Judge Cohn or any other United States Magistrate Judge.

to every report and recommendation)). Nevertheless, whether timely objections are made or not, the district court may accept, not accept, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); Local Rule 72.31.

 When reviewing the denial of disability benefits, the court must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988); *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir.2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.1999), *Johnson*, 529 F.3d at 200. It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If the ALJ's decision is supported by substantial evidence, the court is "bound by those findings." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir.2001) (citation omitted). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore, .

[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner of Social Security must follow a five-step process to determine if an applicant is disabled under the Act. This legal framework requires the Commissioner to sequentially determine: (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work, and; (5) whether the applicant's impairment prevents the applicant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Since the five-step legal framework for addressing a disability claim was properly stated in the R & R, (Doc. 18, at 55–56), this portion of the R & R is incorporated by reference.

## II. RELEVANT MEDICAL BACKGROUND

Judge Cohn's report and recommendation ("R & R") contains a thorough review

of the plaintiff's medical history. (Doc. 18, at 9–54). The plaintiff did not file any objection to Judge Cohn's factual determinations regarding her medical history, so they will be adopted. *See Butterfield v. Astrue*, 2010 WL 4027768, *3 (E.D.Pa. Oct. 14, 2010) ("To obtain de novo determination of a magistrate[ ] [Judge's] findings by a district court, 28 U.S.C. § 636(b)(1) requires both timely and specific objections to the report.") (quoting *Goney v. Clark*, 749 F.2d 5, 6 (3d Cir.1984)). The court will restrict its discussion below to the relevant medical background as it pertains to the plaintiff's objections.

## III. DISCUSSION

On March 24, 2014, Plaintiff Teresa Weidman filed her Complaint in the instant action, (Doc. 1), seeking judicial review of the Commissioner of the Social Security Administration's ("Commissioner") denial of her claim for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act. 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). The Commissioner filed an answer as well as an administrative transcript of the relevant proceedings on April 30, 2014 (Doc. 7, 8). And, on August 4, 2014, the Court referred this case to Judge Cohn. Plaintiff filed a brief in support of her appeal on August 4, 2014, (Doc. 12), and on September 5, 2014, the Commissioner filed a response brief. (Doc. 13). Finally, on September 16, 2014, the plaintiff filed a reply brief. (Doc. 14).

Judge Cohn issued a comprehensive R & R on August 7, 2015 recommending that the plaintiff's appeal be denied and the action dismissed. On August 23, 2015, the plaintiff filed objections to the report recommending dismissal of her action, on three bases: that Judge Cohn erred in finding that substantial evidence supports (1) the ALJ's credibility assessment; (2) the ALJ's Step Three Findings; and (3) the ALJ's RFC Assessment. The defendant Commissioner waived its opportunity to respond to the plaintiff's objections on September 4, 2015. This court will review each of the plaintiff's objections in turn.

### A. Whether Substantial Evidence Supports the ALJ's Credibility Assessment

■ The plaintiff argues that the ALJ's credibility assessment, finding the plaintiff, Weidman, not credible, was not supported by substantial evidence. The plaintiff points to four specific findings by the Commissioner, and affirmed by the Magistrate Judge's R & R, regarding her credibility and the severity of her symptoms. Upon review, the court finds that the ALJ's credibility determination was proper and supported by substantial evidence.

### 1. Somatoform Disorder Is Consistent with a Finding of Adverse Credibility

The plaintiff first contends that Judge Cohn erred in affirming the ALJ's finding that the plaintiff had "a severe impairment of undifferentiated somatoform disorder and ... that she was not entirely credible and feigned or exaggerated the severity of her symptoms." (Doc. 18, at 61–62); (Doc. 19, at 2). The plaintiff's argument is based upon the ALJ's failure to conduct the "legally correct analysis" in light of the plaintiff's diagnosis of a somatoform disorder.

■ The issue of credibility in this case, as Judge Cohn accurately noted in the R & R, presents an issue of first impression in the Third Circuit, namely, "whether it is error for an ALJ to make an adverse credibility finding when a claimant has been diagnosed with a somatoform disorder (a diagnosis which requires a determination regarding malingering) and when

the ALJ determines that the somatoform disorder was a severe impairment under step two." (Doc. 18, at 57–58). Judge Cohn's R & R notes the importance of credibility determinations with respect to "somatization and undifferentiated somatoform disorders where their diagnostic criteria explicitly require a finding that the reported symptoms are 'not intentionally produced or feigned (as in Factitious Disorder or Malingering).' " (Doc. 18, at 58). Ultimately, Judge Cohn determined, "[w]hile the diagnostic criteria require a finding that the symptoms were not produced by malingering, it is possible [ ] for a mixed diagnosis of both undifferentiated somatoform disorder symptoms and malingering to coexist." *Id.* at 59.[2] Thus, this court adopts in full Judge Cohn's rigorously examined and reasoned conclusion that "where a claimant has been diagnosed with undifferentiated somatoform disorder and an ALJ concludes that the disorder was a severe impairment, it is legally possible for an ALJ to make an adverse credibility finding." *Id.* at 67, 58–67; *see also Carradine v. Barnhart*, 360 F.3d 751, 756–81 (7th Cir.2004) (J. Coffey, dissenting); *Minner v. Am. Mortgage & Guar. Co.*, 791 A.2d 826, 871–72 (Del.Super.2000).

Credibility may be analyzed despite a diagnosis of undifferentiated somatoform disorder. Therefore, plaintiff's objection that the ALJ analyzed the plaintiff's credibility "without doing legally correct analysis" must fail.

In addition, the plaintiff, in her objections, contends that no medical opinion in the record supports a finding of malingering or factitious disorder, and that the Magistrate Judge erred in basing its entire credibility assessment on "baseless malingering and factitious disorder allegations." (Doc. 19, at 2–3).

"Allegations of pain and other subjective symptoms must be supported by objective medical evidence." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir.1999) (citing 20 C.F.R. § 404.1529); *see also* 20 C.F.R. § 404.1508. If objective medical evidence fails to substantiate the severity of the claimant's pain or symptoms, then the ALJ must make a credibility finding regarding the claimant's subjective statements. Social Security Ruling (SSR) 96–7p. An ALJ's credibility finding with respect to the severity of a claimant's symptoms requires consideration of the entire record. *Id.* More specifically, the ALJ must consider the following seven factors, in totality: 1) claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, claimant receives or has received for relief of pain or other symptoms; (6) any measures claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p; 20 C.F.R. § 404.1529; *Seney v. Comm'r Soc. Sec.*, 585 Fed.Appx. 805,

---

**2.** Judge Cohn thoroughly reviews the Diagnostic and Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision (DSM–IV–TR) (2000), which states in relevant part:

[s]ymptoms that are intentionally produced should not count toward a diagnosis of Somatization Disorder. However, the presence of some factitious or malingered symptoms, mixed with other nonintentional symptoms, is not uncommon. In such mixed cases, both Somatization Disorder and a Factitious Disorder or Malingering should be diagnosed.

DSM–IV–TR at 488–89.

808–09 (3d Cir.2014) (unpublished decision).

In the instant case, the ALJ examined the record and, while she did not explicitly enumerate her findings according to the seven categories mentioned above, she addressed the entire record and concluded that the plaintiff's "allegations regarding her symptoms and limitations [are] not fully credible" (Tr. 340, 333–344). Judge Cohn, in his R & R examined the ALJ's decision and correctly found that each of the seven factors was assessed by the ALJ, and that the totality of the evidence supported the ALJ's finding that the plaintiff was not fully credible. (Doc. 18, at 69–79). More specifically, the ALJ identified "several occasions where the claimant gave poor effort, malingered and alleged excessive symptoms, which tends to question the extent to which her allegations are believable." (Doc. 15, at 334–35).The objective record supports the ALJ's observations, and provides substantial evidence that the plaintiff may have feigned or exaggerated her symptoms, thus calling into question her credibility.[3] These instances of possible malingering in conjunction with the totality of the evidence provides ample support for the ALJ's adverse credibility finding.

## 2. The ALJ Properly Assessed Plaintiff's Syncopal Episodes

The plaintiff next contends that the ALJ's assessment of the plaintiff's syncopal episodes, which formed part of the seven factor analysis to determine credibility, was incorrect and unsupported by substantial evidence. The ALJ noted that the plaintiff "has never hurt herself" during one of her syncopal episodes. (Doc. 15, at 333). The plaintiff states that this allegation is not supported by substantial evidence; she points to one instance, documented in the record, when she suffered neck pain as a result of a syncopal episode (a fall) and was given morphine for pain relief as support that she has in fact hurt herself during an episode. (Doc. 19, at 4 (citing Doc. 15, at 860)).

As Judge Cohn accurately noted in his R & R, the record indicates that the during the instance cited by the plaintiff, the plaintiff only complained of *subjective* neck pain. (Doc. 15, at 860). This does not constitute a physical injury, and thus, the plaintiff's objection must fail. Furthermore, the entirety of the record supports the ALJ's determination that there is no evidence of objective indicia of falls (e.g. contusions or bruising) arising from syncopal episodes. *See* Doc. 18, at 85–86. Thus, the ALJ did not err in concluding that the syncopal episodes have never resulted in physical injury to the plaintiff and correctly noted this fact as part of its seven factor credibility analysis.

## 3. The ALJ's Inference Regarding Plaintiff's Past Drug Use Is a Harmless Error

In addition, the plaintiff argues that the ALJ drew an adverse inference concerning the plaintiff's credibility due to testimony about past crack cocaine use. (Doc. 19, at 4–5). The record demonstrates that plaintiff previously used crack cocaine from 2000 to 2004. The plaintiff stated that she quit "cold turkey" without aid of any substance abuse treatment programs. (Doc. 15, at 1067, 1071, 1074, 1234). The ALJ's decision found the plaintiff's statement that she "quit cold turkey" to be implausible, and the ALJ further stated that the

---

**3.** Judge Cohn's R & R identifies the specific instances in the record where six different doctors observed indicia of the plaintiff intentionally feigning or exaggerating her symptoms. (Doc. 18, at 81–86); (Doc. 15, at 812, 819, 840, 848, 971–72, 975). This court adopts and incorporates the R & R's discussion on pp. 81–86 by reference.

testimony contributed to her finding that the plaintiff was not credible. (Doc. 15, at 333).

■ As Judge Cohn noted, "evidence can be used to discount credibility if such evidence demonstrates a contradiction or inconsistency." (Doc. 18, at 89 (quoting *Gleason v. Colvin*, No. 3:14–CV–00021–GBC, 152 F.Supp.3d 364, 380–81, 2015 WL 4232569, at *13–14 (M.D.Pa. July 13, 2015)). The record contains no contradictory or inconsistent evidence that would suggest the plaintiff did not quit cold turkey. Despite the absence of any contrary evidence, the ALJ found the plaintiff's testimony that she "quit cold turkey" implausible and used this determination to support a finding that the plaintiff is not credible. (Doc. 15, at 333). This court agrees with Judge Cohn's finding that the ALJ erred in drawing an improper inference about the method in which the plaintiff stopped using crack cocaine. (Doc. 18, at 90). The ALJ determined the plaintiff's credibility by looking to the totality of the circumstances, and as discussed previously, the record includes extensive evidence,[4] other than the abovementioned drug use testimony, to support the ALJ's adverse credibility finding. Therefore, like Judge Cohn, this court finds that the ALJ's improper inference solely amounts to harmless error and does not negate a finding that the plaintiff is not credible. (Doc. 18, at 91).

### 4. ALJ's Mischaracterization of the Findings of Different Doctors Is a Harmless Error

■ Finally, the plaintiff objects to the ALJ's mischaracterization of the findings of different doctors. The plaintiff alleges that the ALJ erroneously stated that doctors used words "such as feigning, malingerer, factitious and exaggerated" in their diagnosis of the plaintiff. (Doc. 19, at 5). Judge Cohn agreed that the plaintiff "correctly pointed out that the ALJ erroneously stated that doctors explicitly determined that Plaintiff was a malingerer." (Doc. 18, at 86–87; Doc. 19, at 5). However, Judge Cohn correctly determined that the mischaracterization resulted in a harmless error. The plaintiff objects that this mischaracterization "clouded the entire decision" and amounts to a harmful error. However, this court agrees with the standard identified in Judge Cohn's analysis:

> The Court in *Williams v. Barnhart*, upheld an ALJ decision where although "[s]ome of the discrepancies pointed out in the ALJ's opinion are not great and might not alone support an adverse credibility determination," other record evidence, supported the ALJ's finding of incredibility. *Williams v. Barnhart*, 87 Fed.Appx. 240, 243–44 (3d Cir.2004).

(Doc. 18, at 88). *See also Napoli v. Colvin*, No. 3:13–CV–01815, 2014 WL 2808603, at *11 at n. 23 (M.D.Pa. June 20, 2014) (finding harmless error under the totality of the evidence); *Bivins ex rel. N.B. v. Astrue*, No. 5:11–CV–51 MSH, 2011 WL 5859954, at *5 (M.D.Ga. Nov. 22, 2011) ("Considering the totality of the medical evidence, the ALJ's erroneous reference to a statement … is harmless…. A remand to have the ALJ perfect the record as to this statement would serve no practical purpose, would not alter the ALJ's

---

4. While the ALJ's analysis of the plaintiff's method of ending her drug use was improper, the record also included evidence that when the plaintiff was initially questioned about past drug use, she "reported she never used illegal drugs," but then later admitted to past crack cocaine use. (Doc. 15, at 333). This untruthfulness weighs in favor of a lack of credibility.

findings, and would be a waste of judicial and administrative resources").

In the instant action, the medical records by six different doctors contain statements relating to or identifying the possibility that the plaintiff's description of her symptoms was exaggerated or intentional. *See supra* Footnote 2. In addition, other evidence found in the record contributes to and support the ALJ's credibility finding, including the plaintiff's history of writing bad checks and initial lying about past drug use. (Doc. 15, at Therefore, looking at the totality of the evidence, substantial evidence supports the adverse credibility finding despite the ALJ's mischaracterization error, which this court concludes is harmless.

### B. Substantial Evidence Does Not Support the ALJ's Step Three Findings

■ At step three of the disability benefits evaluation process, the ALJ must determine whether a claimant's alleged impairment matches a number of listed impairments that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; *Sullivan v. Zebley*, 493 U.S. 521, 529, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); *Burnett v. Comm. of SSA*, 220 F.3d 112, 119 (3d Cir.2000). A claimant bears the burden of establishing each element of a Listing, or "all of the criteria in the listing." 20 C.F.R. § 404.1525(d). If even one element is not satisfied, then the ALJ has substantial evidence to conclude that the claimant's impairment is not equivalent and does not meet a Listing. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir.1992).

■ Plaintiff objects to Judge Cohn's determination that the ALJ was correct in finding that the plaintiff does not meet the requirements of Listing 12.07B. (Doc. 19,

at 6–9). Listing 12.07B requires that the claimant demonstrate that his medical symptoms (from the 12.07A finding) result in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.07. The ALJ found that the plaintiff did not suffered from marked restriction of activities of daily life; did not suffer marked difficulties in maintaining social functioning or concentration, persistence, or pace; and did not undergo repeated episodes of decompensation of extended duration. (Doc. 15, at 329–31). The plaintiff objects to the ALJ's determination as to 12.07B(2)-(4), and also to Judge Cohn's "summarized and unfounded reasoning" that affirms the determination. (Doc. 19, at 6). This court agrees that the ALJ's determination was supported by substantial evidence, but for slightly different reasons, which will be discussed below.

First, plaintiff states that she has marked impairment in maintaining social functioning, and presents several facts from the consultative examination performed by Dr. Laguna to support the assertion. These facts indicate that the plaintiff sometimes feels frustrated by her family and others, and suffers from "emotional numbing and dissociative disorders." (Doc. 19, at 7; Doc. 15, at 957–59). However, the ALJ looked at the entire record, not simply the examination of Dr. Laguna. The ALJ noted the plaintiff's testimony at the hearing, where the plaintiff stated she talks on the phone with others, she lives

with her husband and children, and a friend takes her to appointments. (Doc. 15, at 330). The plaintiff's behavior clearly demonstrates an ability to get along with others and interact effectively.[5] In addition, Dr. Fretz' report, which reviewed the plaintiff's medical record and history, stated that the plaintiff suffered solely from *moderate impairment* in maintaining social functioning, (Doc. 15, at 438), and as will be discussed below, the ALJ properly placed great weight on Dr. Fretz' opinion. (Doc. 15, at 343). The ALJ's determination, which relied on objective record evidence, medical opinions, and hearing testimony, clearly amounts to substantial evidence and must be upheld.

Next, the plaintiff objects on the basis that the plaintiff suffers from a marked impairment in maintaining concentration, persistence, or pace, and that the ALJ incorrectly found otherwise. (Doc. 19, at 7). This 12.07B criterion refers to the ability of the claimant to "sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks." 20 C.F.R. pt. 404, subpt. P, app. 1. "Marked" impairment here refers to the "nature and overall degree of interference" with work functioning, and is generally assessed through mental status examinations (e.g. serial sevens or threes) or simulated work tasks that require short term memory and completion of the task. *Id.* The plaintiff claims that she has marked difficulties, and supports her assertion by identifying Dr. Laguna's assessment that she had "a poor capacity for calculating serial threes," and

that treatment records that assign low GAF scores. (Doc. 19, at 7).

The ALJ, on the other hand, focused on objective evidence from the record showing that the plaintiff's condition improves with treatment and that she left her last job due to a physical hand problem, not a problem sustaining the job mentally. (Doc. 15, at 330). Later in the ALJ's opinion, she places only partial weight on Dr. Laguna's reports, but great weight on Dr. Fretz' report which concludes that the plaintiff has only "mild" difficulties with concentration, persistence, or pace. (Doc. 15, at 343, 438). The ALJ also addresses the low GAF scores by noting the range of scores the plaintiff received through years of treatment (25 to 55). The ALJ further explains that GAF scores are subjective and attach only to a particular moment in time, but fail to take into account "a longitudinal view of the claimant's functioning." (Doc. 15, at 342). Thus, because the plaintiff's functioning and GAF scores improved with treatment, the lower scores do not reflect the plaintiff's functional ability today.

While the ALJ did give some weight to the plaintiff's poor capacity calculating threes and following instructions, the remainder of the objective evidence, particularly the medical treatment reports and Dr. Fretz's report, supports the conclusion that the plaintiff has greater than mild, but less than marked impairment. Thus, the ALJ's determination that the plaintiff has moderate restrictions in this area of functioning is supported by substantial evidence and will be upheld.

---

**5.** "Social functioning refers to your *capacity to interact independently, appropriately, effectively, and on a sustained basis* with other individuals. Social functioning includes *the ability to get along with others*, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.... We do not de-

fine "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function." 20 C.F.R. pt. 404, subpt. P, app. 1 (emphasis added).

Finally, the plaintiff contends that she has experienced multiple · episodes of decompensation, each of which was of extended duration, which satisfy the fourth criterion under 12.07B. (Doc. 19, at 6–8). The plaintiff states that Judge Cohn incorrectly found that substantial evidence supported the ALJ's determination that this criterion was not satisfied. (Doc. 19, at 9). Episodes of decompensation are defined by 20 C.F.R. Part 404, Subpart P, Appendix I as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1. These episodes must be repeated and of extended duration, which means there must be three episodes in one year (or an average of once every four months), and each must last for "at least 2 weeks." *Id.*

Judge Cohn's analysis in the R & R arrived at the correct conclusion, namely that substantial evidence supported the ALJ's determination that the plaintiff did not experience multiple episodes of decompensation of extended duration, but we will affirm for a different reason. Judge Cohn stated that the ALJ's finding that the plaintiff is not credible effectively prevents the plaintiff's emergency room visits from counting as episodes of decompensation because her symptoms during those visits were likely feigned. (Doc. 18, at 92). However, this issue can be decided without consideration of the plaintiff's credibility. Credible or not, the alleged episodes of decompensation are *not of extended duration.* Extended duration, as stated previously, requires that each episode last for at least two weeks. All alleged episodes, except for the plaintiff's attendance at Philhaven Acute Partial Program from July 15, 2011 to August 12, 2011, do not meet

the two week requirement. (Doc. 19, at 8). The ALJ accurately noted these facts and properly concluded that "[w]hile there is evidence of multiple exacerbations in symptoms or signs associated with the claimant's mental impairments, the lack of extended duration and evidence of improvement with treatment ... do[ ] not meet the requisite adaptive functioning deficits to meet this listing." (Doc. 15, at 331). Therefore, substantial evidence supports the ALJ's finding that this criterion is not met.

And, furthermore, because the plaintiff cannot satisfy *any* of the four 12.07B criteria, substantial evidence supports the ALJ's finding that the plaintiff does not meet the criteria required for a 12.07 Listing.

### C. Whether Substantial Evidence Supports the ALJ's Residual Functional Capacity (RFC) Assessment

The plaintiff lastly objects on the grounds that the residual functional capacity (RFC) assessment was not supported by substantial evidence because the ALJ incorrectly weighed medical opinion testimony and thus failed to include limitations related to the plaintiff's somatoform disorder in her RFC assessment. Specifically, the plaintiff points to the ALJ's reliance upon Dr. Fretz, a non-treating, non-examining medical source and the ALJ's failure to give any weight to Ms. Yevtukh, a non-acceptable medical source.

An RFC assessment, or residual functional capacity assessment, is required after Step 3 but before moving on to Step 4 of the Commissioner's sequential evaluation process. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity is defined as the most a claimant can do in a work setting despite the physical and men-

tal limitations resulting from all of her impairments. *Id.* at § 404.1545(a)(1). The Commissioner must use all relevant evidence in the record to make the RFC assessment. *Id.*

In reviewing the record to make the RFC assessment, the ALJ must take into account all the medical opinion evidence along with all other relevant evidence in the record, 20 C.F.R. § 404.1527(b), and must allocate weight to each medical opinion upon which it relies. In the R & R, Judge Cohn accurately described what qualifies as medical opinion evidence and the process by which it is then analyzed and weighed:

> "Medical opinions are statements from ... *acceptable medical sources* that reflect judgments about the nature and severity of [a claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimants] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (emphasis added). Only licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are considered "acceptable medical sources." *See* 20 C.F.R. §§ 404.1513(a) & 416.913(a). Evidence from "other sources" that are not "acceptable medical sources" ... are *not entitled controlling weight*. *See* 20 C.F.R. §§ 404.1513(a) and (d)(1), 404.1527(a)(2), 416.913(a) and (d)(1), 416.927(a)(2); Social Security Ruling (SSR) 96–2p (rule for according controlling weight to "treating source medical opinions"); SSR 06–03p; *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir.1999); *cf. Gomez v. Chater*, 74 F.3d 967, 970–71 (9th Cir.1996) (Opinions from "other sources" can be accorded "less weight

than opinions from acceptable medical sources").

(Doc. 18, p. 94) (emphasis added).

Any medical opinion from an acceptable medical source, unless it is designated a controlling treating medical opinion, must be analyzed according to factors set forth in the Code of Federal Regulations. 20 C.F.R. § 404.1527(c). These factors include: the examining and treating relationship; the length and frequency of the relationship; the extent and nature of the relationship; the amount of objective medical evidence supporting the opinion; consistency with the entire record; specialization of the medical professional; and other factors that tend to support or contradict an opinion. *Id.*

### 1. The ALJ Did Not Err in Giving "Great Weight" to Dr. Fretz' Opinion

The plaintiff specifically objects to the R & R because it affirms the ALJ's allocation of "great weight" to the opinion of Dr. Fretz, a non-treating, non-examining medical source. The plaintiff argues that a non-treating, non-examining acceptable medical opinion can only be given "little, if any, weight." (Doc. 19, p. 9). However, a non-treating, non-examining medical opinion must be analyzed according to the factors set forth above to determine its weight, and may ultimately be entitled to more than "little, if any, weight." In fact, a non-treating, non-examining medical opinion may be allocated greater weight than other acceptable and non-acceptable medical sources, provided the ALJ gives adequate explanation for its determination. SSR 96–6p; 20 C.F.R. § 404.1527(c); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000); *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir.1999).

In the instant action, the ALJ clearly explained why it afforded Dr. Fretz' opinion great weight:

Dr. Fretz, opined the [plaintiff] can understand, remember and carry out simple tasks. (Exhibit 2A). This is consistent with the medical records from Dr. Laguna, Philhaven Hospital, Hershey Medical Center and Good Samaritan Hospital, which all reveal the [plaintiff] having depression and anxiety, and related symptoms, that would reasonably limit the [plaintiff]'s ability to carry out more detailed tasks and instructions. (*See generally* Exhibits 2F; 3F; 4F; 6F; 8F–12F; 13F; 16F; 17F). Moreover, Dr. Fretz's opinion is based on his specialty in mental health and his familiarity with the Social Security Administration disability program. His opinion reasonably comports with the evidence contained in the record at the time of the assessment, and evidence received at the hearing level did not demonstrated a worsening or deterioration in [Plaintiff]'s condition requiring more restrictive limitations.

(Doc. 15, p. 343). This explanation includes consideration of numerous factors, as required by section 404.1527(c) of the regulations, namely the specialty and knowledge of Dr. Fretz, objective medical evidentiary support, consistency with other evidence at the hearing, and other factors. Thus, the ALJ's decision to place great weight on Dr. Fretz' opinion is proper, and the plaintiff's objection must be denied.

## 2. The ALJ Did Not Err in Giving "No Weight" to Ms. Yevtukh's Opinion

The plaintiff also raises an objection regarding the ALJ's decision to give "no weight" to treating Nurse Practitioner, Ms. Yevtukh's opinion. Ms. Yevtukh is a Nurse Practitioner who treated the patient every 6 months for two years, from 2010 to 2012. (Doc. 15, p. 1245). As stated above, "[o]nly licensed physicians (medical or osteopathic doctors), licensed

or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are considered 'acceptable medical sources.'" (Doc. 18, p. 94). A nurse practitioner is not an acceptable medical source under the regulations; therefore, a nurse practitioner's opinion cannot be given controlling weight. However, an ALJ may consider a non-acceptable medical opinion to assess severity of impairments and functional effect, and may reject or accept the opinion after explaining the reasons for doing so. (Doc. 18, p. 95); SSR 06–03p; *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir.2000) (explaining that an ALJ must consider all nonmedical evidence and explain why it rejects or accepts such testimony).

The plaintiff, in her objections, admits that Ms. Yevtukh is not an acceptable medical source, but states that the ALJ failed by not giving her opinion *any weight* in the RFC assessment. (Doc. 19, p. 11). The plaintiff states, more specifically, that the ALJ incorrectly found Ms. Yevtukh's opinion to be inconsistent with objective evidence in the record, thus requiring that it be given "no weight." To support her objection, the plaintiff points to consistencies between the RFC questionnaire completed by Ms. Yevtukh and Ms. Yevtukh's own previous treatment notes. However, the plaintiff fails to address the contradictory and inconsistent evidence found throughout the voluminous record for this case.

The ALJ found inconsistencies between Ms. Yevtukh's RFC questionnaire and both her own findings regarding the plaintiff as well as objective evidence in the record. Judge Cohn thoroughly reviewed the medical evidence presented in this case and identified numerous pieces of evidence that are inconsistent with or contradict Ms. Yevtukh's opinion. *See* Doc. 18, p. 97–

98. Furthermore, Ms. Yevtukh herself states that she is not a neurologist and she does not treat the plaintiff's depression; these statements further weaken her conclusions with regard to the plaintiff's physical limitations. (Doc. 15, p. 342, 1245). Therefore, Judge Cohn properly found that the ALJ adequately explained her allocation of weight to Ms. Yevtukh's opinion, and that the record supported such determination.[6] This objection will, thus, be denied.

## IV. CONCLUSION

For the foregoing reasons, the ALJ's decision to deny the plaintiff's Social Security claim is supported by substantial evidence. Accordingly, the R & R issued by Judge Cohn, (Doc. 18), is **ADOPTED.** The final decision of the Commissioner is **AFFIRMED,** and the plaintiff's appeal, (Doc. 1), is **DENIED.** An appropriate order shall issue.

### ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1. The plaintiff's objections to the report and recommendation, (Doc. 19), are **DENIED.**

2. The report and recommendation, (Doc. 18), is **ADOPTED.**

3. The plaintiff's appeal, (Doc. 1), of the defendant Commissioner's decision, is **DENIED.**

4. The Clerk of Court shall close this case.

---

**6.** The plaintiff also objected that the ALJ's failure to give weight to Ms. Yevtukh's opinion resulted in an improper RFC assessment that did not take into account all of the plaintiff's physical problems and syncope episodes.

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL

GERALD B. COHN, UNITED STATES MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

### I. Introduction Summary

The administrative law judge ("ALJ") thoroughly reviewed and accurately characterized the record. Substantial evidence supports the ALJ conclusion that Plaintiff's claims were not credible and that a number of her symptoms were the result of malingering. Plaintiff contends that the ALJ erred in rejecting her credibility on these grounds because she was diagnosed with a somatoform disorder, not malingering.

A somatoform disorder may produce impairments severe enough to warrant an award of social security benefits. A somatoform disorder is characterized by symptoms that cannot be fully explained by a known medical reason, another mental disorder, or the direct effects of a substance. Although the diagnostic criteria require ruling out whether symptoms are the result of malingering, a somatoform diagnosis may coexist with malingering. In other words, it is possible for an individual to have a "mixed" diagnosis where some symptoms are due to a somatoform disorder, while other symptoms are intentionally feigned or exaggerated. Hence, somatoform disorders and malingering are not mutually exclusive. A somatoform diagnosis does not automatically preclude an ALJ from making an adverse credibility determination.

Because this court finds the ALJ's decision to accord no weight to Ms. Yevtukh's non-acceptable medical opinion proper, then this objection has no foundation and is thus denied as well. (Doc. 19, p. 12).

Plaintiff reported to have been raped at the age of five-years-old and reported head trauma from a domestic violence incident in 2007. The records received prior to the June 2012 ALJ decision, reveal that Plaintiff has been seen by at least forty different doctors and other healthcare professionals over a span of roughly four years. Plaintiff has underwent a number of outpatient medical visits, clinical tests, consultations, outpatient psychiatric treatment, therapy, has underwent inpatient psychiatric treatment twice (July 2011 and April 2012), and has visited the emergency department approximately one time in 2008, two times in 2009, three times in 2010, eight times in 2011, and once in 2012. During these many instances of seeking treatment, Plaintiff reported symptoms of dizziness, chest-pounding, and syncopal episodes where she would pass out and not remember what happened. Examination and testing throughout this four year span generally revealed benign findings.

Six different physicians whose reports were reviewed and approved by six additional attending physicians (on January 26, 2011, February 6, 2011, February 15, 2011, February 16, 2011, April 9, 2011, and April 13, 2011), observed indicia of Plaintiff intentionally feigning symptoms. Plaintiff has a criminal conviction for writing bad checks and initially lied in testimony about prior illegal drug use.

Plaintiff's inconsistent reporting of her symptoms and repeated indicia of feigned symptoms support the ALJ's determination that Plaintiff did not actually experience a number of the symptoms and that she exaggerated other symptoms. Agency mental health experts concluded that Plaintiff exaggerated her level of dysfunction and did not diagnose Plaintiff with any type of somatoform disorder. Rather,

agency mental health experts found that Plaintiff met the diagnostic criteria for major depressive disorder; posttraumatic stress disorder ("PTSD"); and personality disorder, not otherwise specified, Cluster B traits. "Cluster B traits," encompasses traits of antisocial, borderline, narcissistic and histrionic disorders, and histrionic disorder is characterized by "pervasive and excessive emotionality and attention-seeking behavior."

The ALJ based her credibility determination on the totality of the evidence and the ALJ did not rely solely on the lack of objective medical evidence to support Plaintiff's subjective symptoms, which may be explained by a somatoform disorder. The ALJ also relied on Plaintiff's inconsistent statements, doctors' observations of indicia of intentionally feigning symptoms, a conviction for writing bad checks, and initially lying during testimony regarding prior illegal drug use. The ALJ properly relied on a state agency psychiatrist who reviewed the record, acknowledged Plaintiff's somatoform diagnosis, yet still concluded she could work, based, in part, on an examination by another state agency psychiatrist who observed that Plaintiff was overstating her level of dysfunction.

Under the deferential substantial evidence standard, the Court is bound by the reasonable conclusions of the ALJ. Even if Plaintiff offers an alternative, reasonable interpretation of the evidence, the Court must uphold the decision of the ALJ if any reasonable person could find the relevant evidence as adequate to reach the decision. All of the opinions relied upon by the ALJ support her assessment. In addition to the inconsistencies between objective and subjective evidence, the ALJ pointed to multiple other legitimate reasons to find Plaintiff less than credible. Plaintiff's so-

matoform diagnosis does not preclude this determination or automatically entitle her to benefits. Consequently, the Court concludes that the ALJ's decision was reasonable and recommends the appeal be denied.

## II. Procedural Background

On January 27, 2011, Teresa Weidman ("Plaintiff") filed as a claimant for disability insurance benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401–34, 1181–1183f, with a last insured date of September 30, 2012,[1] and claimed a disability onset date of November 30, 2010. (Administrative Transcript (hereinafter, "Tr."), 326, 526–547). After the claim was denied at the initial level of administrative review on June 21, 2011 (Tr. 426–445), the administrative law judge ("ALJ") held a hearing on May 15, 2012. (Tr. 354–425). On June 8, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 323–350). On August 7, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 315–320), which the Appeals Council denied on January 28,

2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1–7).

On March 24, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. (Doc. 1). On May 22, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 7, 8).[2] On April 30, 2014, the Court referred this case to the undersigned Magistrate Judge. On August 4, 2014, Plaintiff filed a brief in support of the appeal. (Doc. 12 ("Pl. Brief")). On September 5, 2014, Defendant filed a brief in response. (Doc. 13 ("Def. Brief")). On September 16, 2014, Plaintiff filed a reply brief. (Doc. 14).

## III. Relevant Facts in the Record[3]

Plaintiff was born in July 1971 and thus was classified by the regulations as a younger person through the date of the ALJ decision rendered on June 8, 2012. (Tr.

---

1. Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D.Pa. May 14, 2015).

2. The administrative transcript originally contained a medical record that did not belong to Plaintiff and thus was stricken from the record and replaced with an amended version. Doc. 15, 16, 17.

3. Plaintiff has submitted medical records after the ALJ's June 2012 decision. With exception of the Type II diabetes diagnosis (Tr. 9, 11, 21), and the first time a health provider

has noted bruising after a syncopal episode (Tr. 276, 1278) (five days after the June 2012 ALJ decision), the new evidence does not concern a later-acquired disability or subsequent deterioration of a previously non-disabling condition. *See* 20 C.F.R. § 404.970(b); *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001); *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). The newly submitted evidence is generally cumulative in that the new medical reports reflect an ongoing pattern of Plaintiff seeking treatment for symptoms that are not demonstrated by objective tests. The evidence also includes medical records from which adverse inferences may be made, such as, where Plaintiff reported that she stopped working in order to raise her children (Tr. 48, 133). This new evidence does not raise a reasonable possibility of a changed outcome to the ALJ's decision. *See Szubak*, 745 F.2d at 833.

344, 364–65); 20 C.F.R. § 404.1563(c). Plaintiff initially alleged the following impairments: 1) seizures; 2) double vision; 3) brain problems; 4) depression; and 5) dizziness. (Tr. 571) (application for benefits). In a letter dated May 14, 2012, through counsel, Plaintiff additionally alleged to have: 1) undifferentiated somatoform disorder; 2) anxiety disorder; 3) PTSD; 4) major depressive disorder; and, 5) personality disorder. (Tr. 351).

Plaintiff completed the twelfth grade. (Tr. 366, 572). Although Plaintiff testified that she was in the special education program at her high school, the records department from her former high school indicated that no records existed indicating that she took special education classes. (Tr. 366, 572, 951). Plaintiff reported that she cared for her mentally and emotionally impaired children (who receive social security disability benefits), pets, and was able to meet personal needs unassisted and without reminders. (Tr. 366, 578–79). Plaintiff reported that she had never obtained a drivers' license because a former abusive boyfriend of eleven years forbade her from driving and so she depends on her husband or a friend to drive her to appointments. (Tr. 367, 415).

Earnings reports demonstrate that Plaintiff has worked off and on since the age of eighteen with the following annual earnings from the most recent eight years: 1) 2004: met earning threshold for four quarters of coverage,[4] totaling $16818.66; 2) 2005: met earning threshold for four quarters of coverage, totaling $4192.64; 3) 2006: met earning threshold for first three quarters of coverage, totaling $3481.25; 4) 2007: did not meet earning threshold for any quarter of coverage, totaling $32.83; 5) 2008: no earnings; 6) 2009: met earning threshold for four quarters of coverage as self-employed, totaling $15,863; 7) from 2010 through 2012, no earnings. (Tr. 558–563). Her past relevant work includes working as a packer and cashier/stocker/storekeeper. (Tr. 344, 593). Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 30, 2010. (Tr. 328.558–563).

### A. Relevant Treatment History and Medical Opinions

#### 1. Good Samaritan Hospital

In a treatment record dated September 24, 2009, in preparation for a tarsal tunnel procedure, it was noted that her medical history included depression and syncopal

---

**4.** After 1977, the Commissioner of the Social Security Administration determines the amount of taxable earnings that will equal a "quarter coverage" for each year, an amount which is determined by using a formula in the Social Security Act that reflects a national percentage increase in average wages. 42 U.S.C.A. § 413; 20 C.F.R. § 404.140; 20 C.F.R. § Pt. 404, Subpt. B, App.; "Quarters of coverage," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 8:10 (2nd ed.) (list of earnings needed to earn one quarter of coverage for years from 1975 to 2012); *see also* "How do you earn Social Security credits?" http://www.ssa.gov/section218training /basic_course_3.htm# 10 (last accessed July 29, 2015) (list of required earnings through 2015). In a claimant's earnings record, the letter "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and the letter "n" indicates that the threshold amount for a quarter of coverage was not earned for a given quarter of that year. *See Understanding an earnings record*, 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.). For example, in 2004, "cccc" would indicate that a claimant has earned at least $900 each quarter of 2004 and "cccn" would indicate that a claimant earned at least $900 for each of the first three quarters of 2004. *See Understanding an earnings record*, 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.); *How do you earn Social Security credits?*, http://www.ssa.gov/section218training/ basic_course_3.htm# 10 (last accessed July 29, 2015).

episodes for two years and although testing was inconclusive, the syncopal episodes may have been due to panic attacks. (Tr. 734).

On January 31, 2010, Plaintiff was brought by an ambulance to the emergency room. (Tr. 716–17). The treatment record noted "panic attack" and that Plaintiff was experiencing gastrointestinal symptoms, dizziness, and hand numbing. (Tr. 716–724). Dr. Michael Rusli diagnosed Plaintiff with viral gastroenteritis and with a panic attack, as evidenced through the hyperventilation. (Tr. 716–726).

On July 6, 2010, Plaintiff arrived by ambulance to the ER due to chest pain radiating into the left arm with the left arm feeling numb and tingly. (Tr. 697–99). Plaintiff reported that she had similar pain three days prior, the pain waxed and waned, and that she also experienced left lower quadrant pain. (Tr. 699–670). Plaintiff also reported that two weeks prior, she had a syncopal episode and hit her sternum on a banister. (Tr. 699, 701).

On November 30, 2010, Plaintiff was hospitalized after she "passed out" after going to the bathroom. (Tr. 682, 686). Her children called 9–1–1 and Plaintiff complained of chest pain when she got into the ambulance and was pain free later at the hospital. (Tr. 682, 686). On examination, Plaintiff was alert and coherent, and she exhibited a normal gait. (Tr. 688). An MRI of her chest revealed no evidence of cardiopulmonary disease. (Tr. 695).

In a treatment record dated April 26, 2012, Plaintiff went to the ER seeking medical attention for suicidal ideation. (Tr. 1253). Once she was at the hospital, Plaintiff reported that her symptoms had improved. (Tr. 1250–55).

2. **Hershey Medical Center: Michelle A. Fischer, M.D.; Krishnamoorthy Thamburaj; Steven M. Stuic, D.O.; Dr. Fauzia Mahr; Krista M. Todoric, M.D.; Aiesha Ahmed, M.D.; Diupreet Kaur, M.D.; Sandra J. Williams, D.O.; Kimberly R. Scholfield, M.D., F.A.C.E.P.; Nina Riggins, M.D.; Matthew P. Wicklund, M.D.; Nancy S. Graves, M.D.; Todd M. Felix, M.D.; Olympia P. Robert, M.D.; Brandon Bryce, M.D.; Thyagarajan Subramanian, M.D.; Divpreet Kaur, M.D.; Michelle Fischer, M.D., MPH, Fernando L. Cortes, MD; David Ermak, D.O.; David J. Gill, M.D.; Matthew L. Silvis, M.D.; Dr. Keith C. Kaplan, M.D.; Thomas Dykes, M.D.; El Centro Coffey, M.D.; Mark J. Kimak, M.D.; Alexandria N. Nickless, D.O.; Rory M. O'Neill, D.O.; Barbara A. Bentz, C.R.N.P.; Sveltana M. Yevtukh C.R.N.P.; Suzanne Frazier, C.R.N.P.**

On January 2, 2008, Plaintiff reported that over the past few days she had experienced dizziness, nausea, headaches, and twenty-four hours of diarrhea. (Tr. 674). According to Plaintiff, a week prior, she passed out onto the floor from similar symptoms. (Tr. 674). Her daughter called EMS and Plaintiff was transported to Good Samaritan Hospital ("GSH") emergency department around December 26th or December 27th. (Tr. 674). Plaintiff reported that she had been having episodes like this periodically, and that with these episodes she often experienced right neck pain radiating sometimes down to her chest and felt as if her heart was pounding. (Tr. 674). Ms. Frazier noted that Plaintiff had been seen over the last few months for varying symptoms and had "encountered a domestic violence incident" a number of months ago and had devel-

oped chronic headaches and neck pain. (Tr. 674).

Ms. Frazier noted that Plaintiff had a "myriad of complaints [after the domestic encounter] of fatigue and facial numbness along with just feeling very weak." (Tr. 674). Plaintiff had been evaluated by neurology and there were no neurological deficits noted and she received physical therapy for what was believed to be cervical strain and paresthesias from the "domestic incident." (Tr. 674). Ms. Frazier noted that:

[Plaintiff's] fatigue has been ongoing. She has had numerous blood tests done most recently being December 17th. At that time she had normal thyroid function, normal Iron profile and CBC and her monospot was negative. Her electrolytes and fasting glucose have been normal.... When questioned further about the syncopal episode, she tells me that recently these episodes are different than the past times we have discussed. [During the previous syncopal episodes], she had felt very panicked and that was the explanation for her weakness and chest pounding. She has been treated for her depression and panic in the past. The most two recent episodes, she feels that she blacked out and had not felt panicked before the event.

(Tr. 674). Regarding the recent change in symptoms, Plaintiff stated that she had been experiencing headaches, not feeling well, not drinking as much fluids and her appetite had been waxing and waning over the last six months. (Tr. 674). At the time of the January 2008 visit, Plaintiff was not experiencing any chest pain, heart pounding, or paresthesias, and reported only feeling extremely weak. (Tr. 674). The examination was unremarkable and Ms. Frazier noted no focal neurological deficits, no neurovascular deficits, and that

Plaintiff's cranial nerves II though XIII were intact. (Tr. 675). Ms. Frazier noted that tests including the EKG were normal and assessed Plaintiff with dizziness, chest pain, gastroenteritis, and a history of depression. (Tr. 675).

On March 11, 2008, Plaintiff sought follow-up treatment for depression. (Tr. 670). Ms. Frazier noted that Plaintiff:

has had many chronic complaints over the last year including physical aches, dizziness, low mood, and chronic headaches; she also has been treated for depression/anxiety. She has in the past been on Celexa and Lexapro with minimal results. She had recurring episodes of fatigue and dizziness. She wondered if that might have been related to the Lexapro. She had been checked for orthostasis and had a negative cardiology evaluation. Since she has been on the Cymbalta, the symptoms have resolved. It is possible that the Lexapro may have been a piece of the problem, although I don't believe that we can blame all her symptoms on the medication. Nonetheless, the medication did not seem to be benefiting her. She has been on Cymbalta for 2 months and tells me that her mood is much improved. She is sleeping without medication and overall her physical aches are much less.

(Tr. 670).

On May 12, 2008, Plaintiff complained of left wrist pain after trying to move some furniture. (Tr. 668). According to a treatment record dated June 23, 2008, Plaintiff complained of a sore throat and came after a visit with the ER and stated that prior to starting the medication from the ER she was experiencing fevers of 99 to 101. (Tr. 666). July 2, 2008, Plaintiff complained of a sore throat and reported that she was seen at the ER of GSH on June 22, 2008 and treated for pharyngitis. (Tr. 664). After completing a five-day

treatment of another medication, she reported that her overall achiness and other body symptoms were improved but, her ears hurt and her throat still itched and burned. (Tr. 664). She tested positive for Strep and diagnosed with Strep pharyngitis. (Tr. 664).

On August 5, 2008, Plaintiff complained of foot pain which she had experienced for three to four weeks but had increased four days prior. (Tr. 660). On August 14, 2008, in response to foot pain, Plaintiff had X-rays which were normal and upon examination, a small plantar spur was noted. (Tr. 652–59). On August 26, 2008, Plaintiff reported pain and swelling in the right leg with nothing alleviating or aggravating the pain. (Tr. 648). Ms. Frazier noted that "[Plaintiff] complains of 10/10 pain, although this seems excessive based on the fact that I am able to push and pull on her leg without her having an extreme reaction. She is able to weight bare, flex, and extend the leg without difficulty." (Tr. 648). Plaintiff voiced concern that her symptoms may be due to a blood clot (Tr. 649), tests were normal (Tr. 650).

In a treatment record dated September 16, 2008, Plaintiff reported of ear pain and dizziness which had persisted for a few weeks. (Tr. 645). Plaintiff had no fever or ear-related symptoms. (Tr. 645). Plaintiff reported a history of having severe dizziness in January of 2008 followed by extensive testing which included cardiac factors, but there were no findings to explain the January 2008 symptoms. (Tr. 645). Ms. Frazier concluded that there were no clinical findings for Plaintiff's dizziness.

On January 5, 2009, Plaintiff went to the ER with complaints of feeling dizzy and sleepy all of the time. (Tr. 641). Ms. Yevtukh noted that three days prior, on January 2, 2009, Plaintiff visited the ER at the GSH due to a syncopal episode with shortness of breath. (Tr. 641). Ms. Yevtukh noted that blood work, CAT scan of her head, and EKG results were within normal limits and Plaintiff was discharged from GSH without any medications. (Tr. 641). Plaintiff reported pain of six out of ten, with Tylenol relieving a dull headache and Ms. Yevtukh assessed her with dizziness. (Tr. 641).

On December 2, 2010, Plaintiff was evaluated by Ms. Yevtukh. (Tr. 888). Plaintiff reported of pre-syncopal episodes two to four times a day over the preceding three weeks. (Tr. 888). Plaintiff reported that the episodes would cause dizziness, fatigue, occasional paresthesias in her hands, blurred vision, decreased hearing, chest pain, and palpitations. (Tr. 888).

After initial treatment at GSH, Plaintiff sought follow-up treatment and tests at Hershey Medical Center on December 2, 2010; December 4, 2010; December 6, 2010, and; December 13, 2010. (Tr. 881–919). Physical examination findings were within normal limits with exception of an EKG which revealed evidence of sinus bradycardia.[5] (Tr. 881–83, 888–89). Plaintiff experienced fatigue and lightheadedness during an exercise echocardiogram, however, an MRI of her brain revealed normal results. (Tr. 883, 885–86).

On January 1, 2011, Plaintiff sought treatment from the ER (Tr. 863–66), due to reported recurrent and persistent dizziness and syncope since November 2010. (Tr. 856). Plaintiff was taken to the hospital after having a "blackout spell" along

---

**5.** Sinus bradycardia is defined as "a slow sinus rhythm, with a heart rate of less than 60 beats per minute in an adult; it is common in young adults and in athletes but also a manifestation of some disorders." Dorland's Illustrated Medical Dictionary, 245 (32nd Ed. 2012).

with daily symptoms of dizziness. (Tr. 856). Plaintiff described these episodes as starting out with dizziness, followed by double vision, and then she would pass out. (Tr. 851). These episodes would happen once or twice a day and she would experience confusion upon waking up. (Tr. 851). During the latest episode just before her "blackout spell," she felt dizzy and remembers waking up after the paramedics arrived. (Tr. 856).

Neurological and physical examinations conducted on January 1, 2011, revealed unremarkable results, and a series of CT scans of Plaintiff's head, abdomen, pelvis, and spine all revealed normal results. (Tr. 864, 869–80, 867–80). Drs. Coffey and Kimak noted that physical examination and diagnostic testing revealed no evidence of acute injury. (Tr. 865–66). In an examination conducted on January 1, 2011, while under the supervision of Dr. Dykes, Dr. Kaplan noted no evidence of mediastinal injury and no local contusions (bruising). (Tr. 859, 879, 880). Examination revealed no abnormalities, and Dr. Felix diagnosed Plaintiff with vertigo, recurrent; diplopia; a syncopal episode possibly related to orthostasis;[6] and, depression. (Tr. 857–59).

On January 20, 2011, Plaintiff reported that she became dizzy and developed double vision. (Tr. 854). During her evaluation, she described repeated episodes of loss of consciousness. (Tr. 854). When asked about other factors in her life, Plaintiff reported that she was having problems with her daughter, but did not go into details. (Tr. 855). Dr. Graves noted that the laboratory work was unremarkable and Plaintiff was referred to further testing with other departments. (Tr. 855).

On January 21, 2011, Ms. Bentz, of the Hershey Cardiology Clinic wrote an outpatient letter to Ms. Yevtukh. (Tr. 851–852). The letter stated that Plaintiff had been evaluated for her syncope episodes. (Tr. 851). Plaintiff had a CT of the head which showed no abnormalities, she also had a stress echocardiogram using the treadmill, but she was unable to complete the test due to dizziness and fatigue. (Tr. 851). However, a dobutamine stress echo determined that her heart was in good condition. (Tr. 851). The summary of other tests and physical examination revealed no abnormal results. (Tr. 851–52).

On January 26, 2011, Plaintiff stated to neurologist Dr. Riggins that she ran out of the medications that helped her symptoms. (Tr. 847). Plaintiff reported a history of having experiencing double vision and dizziness followed by a loss consciousness which started about a month prior and subsequently experienced four to six similar episodes since that time. (Tr. 847). Dr. Riggins noted that Plaintiff's medical history included daily persistent headaches reported after head trauma in 2007 due to domestic violence. (Tr. 847). Plaintiff reported that she stopped using rock cocaine approximately four years ago and reported no other substance abuse. (Tr. 847). Upon examination, Plaintiff reported being unable to see all of Dr. Riggins' fingers and those she saw were blurry. (Tr. 848). Dr. Riggins observed no neurological abnormalities. (Tr. 848). With regard to motor skills and strength, Dr. Riggins stated that such was "difficult to assess completely as [Plaintiff] create[d] very poor effort," however, assessed Plaintiff's gross motor abilities as 5/5 bilaterally. (Tr. 848). Upon evaluation of Plaintiff's sensation, Dr. Riggins observed, intact reflexes for all of the extremities, except

---

**6.** Orthostatism is defined as "an erect standing position of the body." Dorland's Illustrated Medical Dictionary, 1339 (32nd Ed.2012).

Plaintiff reported "inconsistantly [sic] mild questionable decrease in sensation to the touch, pinprick from the different areas on her left arm." (Tr. 848).

From February 2, 2011, to February 5, 2011, Plaintiff underwent an EEG study wherein Plaintiff pressed a button to indicate symptoms of dizziness and blacking out. (Tr. 825–26, 843). However, "[n]o electrographic abnormalities were seen with the events/symptoms" that Plaintiff indicated and the ambulatory EEG was deemed normal with no epileptiform features indicated from Plaintiff reported "spells/events." (Tr. 826).

On February 6, 2011, Plaintiff sought treatment at the ER. (Tr. 833–35). Plaintiff had three "loss of consciousness episodes" that day and underwent a consultation with Dr. Kaur under the supervision of Dr. Subramanian, Director of Division of Movement Disorders and professor of Neurology. (Tr. 833). Dr. Kaur noted that all of these episodes have been reported by her husband as Plaintiff did not remember any of these episodes. (Tr. 833). The day of the consultation, Plaintiff reported that she had two episodes in the morning and one in the afternoon while she was sitting on the couch watching television. (Tr. 833). After the last episode, Plaintiff's husband attempted to wake her with a sternal rub, however, she remained unresponsive. (Tr. 833). Treatment notes indicated that paramedics found her unresponsive when they arrived and gave her 2mg of Narcan [7] and she became responsive. (Tr. 837). Plaintiff denied taking any medications to induce unresponsiveness. (Tr. 837). The differential diagnosis [8] for Plaintiff's symptoms included: urinary tract infection, alcohol intoxication, drug abuse, dehydration, electrolyte imbalance, depression, anxiety, medication reaction, pseudoseizures, and psychiatric causes. (Tr. 838). Urine drug screen and alcohol screen tests were ordered. (Tr. 839).

In another treatment record dated February 6, 2011, Dr. Williams examined Plaintiff and was supervised by Dr. Scholfield. (Tr. 840). Dr. Williams observed:

At one point, [Plaintiff] rang for nurse, then when nurse went into room, [Plaintiff] was unresponsive to voice with fluttering eyelids. I was called in, tried sternal rub with no change, then put tongue blade in to check for gag reflex. [Plaintiff] had intact gag and immediately after, woke up and said "What happened?" [Plaintiff] had 2 more self-limited episodes while [I] was here.

(Tr. 840).

On February 8, 2011, Plaintiff underwent a MRI of her brain, an angiogram of her head, an MRI angiography of her cervical spine. (Tr. 829–30). Dr. Thamburaj interpreted the tests and found them unremarkable. (Tr. 830).

7. Narcan "prevents or reverses the effects of opioids including respiratory depression, sedation and hypotension. Also, [Narcan] can reverse the psychotomimetic and dysphoric effects of agonist-antagonists such as pentazocine. [Narcan] is an essentially pure opioid antagonist, i.e., it does not possess the 'agonistic' or morphine-like properties characteristic of other opioid antagonists. When administered in usual doses and in the absence of opioids or agonistic effects of other opioid antagonists, it exhibits essentially no pharmacologic activity." *Narcan Approval* History, NDA 016636, Feb. 11, 2002, Label, FDA, http://www.accessdata.fda.gov/drugsatfda_docs/label/2002/016636s052s054lbl.pdf (last accessed July 19, 2015).

8. "Differential diagnosis" is defined as "the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." Dorland's Illustrated Medical Dictionary, 507 (32nd Ed.2012).

On February 15, 2011, Plaintiff went to the emergency room due to sudden vision loss. (Tr. 811). Plaintiff reported that over the prior two months, she would have episodes where she would develop double vision followed by complete left eye visual field obscuration, which would last for a few minutes and then would resolve completely on its own. (Tr. 811). Plaintiff reported that recently, she also had continued episodes involving her right eye, where symptoms begin with double vision followed by vision in both eyes going completely black and lasting for a couple of minutes. (Tr. 811). It was also noted that Plaintiff's MRI/MRA was recently taken with the findings reported as "hypointense T2 signals in the bilateral globus pallidus substanyia nigra retina nucleus and dentate nucleus of the cerebellum uncommon for the age" and "a normal variant in the absence of extrapyramidal symptoms such as tremors, rigidity, or akinesia, otherwise was negative." (Tr. 811, 821, 823–24, 829–30).

During examination, Plaintiff reported decreased sensation over all three left branches of the trigeminal nerve, ten percent of the right, and a reported "seemingly bilateral cranial nerve XI weakness." (Tr. 812). However, Dr. Todoric observed that the results "seem[ed] somewhat effort related." (Tr. 812). Dr. Todoric noted that Plaintiff was able to do finger-to-nose without difficulty even though Plaintiff claimed to continue to experience bilateral loss of vision. (Tr. 812). Dr. Todoric observed that Plaintiff also correctly copied when Dr. Todoric said "do this" while raising her arms parallel or spreading her fingers, although Plaintiff claimed that she was unable to see a pen or name its color. (Tr. 812). According to Dr. Todoric, Plaintiff stated that she was unable to complete other visual tests saying "no ifs, ands, or buts." (Tr. 812). Dr. Todoric determined that Plaintiff should: be admitted for neurology observation due to questionable lesions shown on a prior MRI and deficit/proprioception on the left; undergo a head CT to rule out other causes for symptoms; undergo a psychiatry consultation to rule out "either malingering, facticious, [sic] or conversion." (Tr. 813).

Plaintiff then underwent a psychiatric evaluation with Dr. Stuic under the supervision of Dr. Mahr, to "rule out conversion versus malingering" as a reason for blindness. (Tr. 808). Dr. Stuic noted that Plaintiff reported that she had a "substantial abuse history" in a previous relationship for eleven and half years with the father of her two children. (Tr. 808). The former relationship included physical, mental, and occasional sexual abuse. (Tr. 808). She reported that this man went to jail for six months as a result of threats of violence towards her and she still had contact with him due to a weekend custody arrangement with her children. (Tr. 809). At the time of the examination she was not in current danger, stating that the last year has been the best of her life. (Tr. 809). List of medications included: 1) Fluoxetine 40 mg daily; 2) Protonix 40 mg b.i.d.; 3) Meclizine 25 mg t.i.d.; 4) Clonazepam 0.5 mg b.i.d.; 5) Midodrine 5 mg t.i.d.; 6) Topamax 25 mg q.a.m., 50 mg q.p.m.; and, 7) Diclofenac 50 mg b.i.d. (Tr. 809). Plaintiff reported not currently drinking or using illicit drugs. (Tr. 809).

Dr. Stuic noted that Plaintiff was cooperative, tracked his movements on walking into the room, maintained good eye contact throughout the exam, and maintained normal speech. (Tr. 809). Dr. Stuic noted that: Plaintiff maintained an alert state of consciousness; she was oriented to time, place and, person; her attention and concentration was normal, and; insight and judgment was fair. (Tr. 809).

For the neurological exam, Dr. Stuic observed that initially when testing extraocular motor function, Plaintiff would not track his finger. (Tr. 809). However, upon repeated tries Plaintiff was able to track his finger without any deficits. (Tr. 809). Dr. Stuic found that Plaintiff's extraocular motor function was intact. (Tr. 809). Dr. Stuic noted that testing of Plaintiff's proprioception with finger-to-nose with the eyes closed as well as finger-nose-to-finger test for any dysmetria revealed that although Plaintiff was able to do the test with her right finger, when she tried with her left finger, she repeatedly pointed the left finger to the right chin. (Tr. 809). Dr. Stuic determined that the rest of the neurologic examination unremarkable. (Tr. 809).

Drs. Stuic and Mahr concluded that in the absence of any organic neurologic disorder identified by their colleagues in neurology, they diagnosed Plaintiff with "[u]ndifferentiated somatoform disorder not otherwise specified," anxiety disorder not otherwise specified, chronic posttraumatic stress disorder, and "major depression disorder, recurrent, mild, resolving." (Tr. 810). Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 45. (Tr. 810). As a plan for treatment, Drs. Stuic and Mahr proposed increasing Plaintiff's prescription of Prozac starting the next morning, for Plaintiff to have outpatient psychotherapy, and to continue treatment with her outpatient psychiatrist at Philhaven. (Tr. 810).

On February 16, 2011, Plaintiff was examined by Dr. Robert under the supervision of Dr. Bryce. (Tr. 818–820). Examination demonstrated normal results except Dr. Robert noted that for the neurological part of the examination, Plaintiff's "[g]rimace does not appear normal," however, questioned Plaintiff's effort. (Tr. 819).

On February 17, 2011, Plaintiff was discharged with a diagnosis of undifferentiated somatoform disorder, presenting with symptoms of bilateral vision loss, likely secondary to major depression disorder (MDD), anxiety, and PTSD. (Tr. 814).

In a record dated March 7, 2011, Dr. Thamburaj interpreted an MR spectroscopy and concluded normal findings for the right basal ganglia and noted:

> Decreased [N-acetyl-aspartate (NAA)] and increased choline in left basal ganglia. Findings could support a diagnosis of idiopathic neurodegenerative disease with brain iron accumulation in the appropriate clinical background. Followup [sic] basal ganglia MRS after 6 months to one year may be obtained to validate the findings and exclude technical factors providing [these] conflicting findings between the right and left side.

(Tr. 804–05).

In an ER treatment record dated March 13, 2011, Plaintiff complained of a headache radiating down her neck and lasting four days. (Tr. 785). Dr. Fischer noted that Plaintiff visited on March 10, 2011, due to syncope and visited March 12, 2011, due to weakness. (Tr. 785). Examination revealed unremarkable results, including a normal neurological examination, and Plaintiff received a prescription for medication. (Tr. 785–87).

Dr. Riggins examined Plaintiff on March 29, 2011, and recorded normal results. (Tr. 990). She reviewed the results of an EEG study, which were normal, as well as an MRI of Plaintiff's brain, which revealed decreased N-acetyl-aspartate (NAA) and increased choline in the left basal ganglia. (Tr. 989, 993–98).

On April 3, 2011, Plaintiff sought emergency treatment after she reportedly lost consciousness for approximately two minutes. (Tr. 984). She also reported an

inability to see out of both eyes, with repeated, intermittent loss of vision in her right eye. (Tr. 984). Examination revealed normal pupils, intact extraocular movements, and normal neurological and physical findings. (Tr. 986). Drs. Nickless and O'Neill also noted no associated injuries with the recent syncopal episode. (Tr. 984).

On April 9, 2011, Plaintiff alleged that she fell to the floor and her whole body began to shake. (Tr. 974). She was fully conscious but did not respond during the episode, which lasted approximately five minutes. (Tr. 974). Later that evening, her feet, arms, and head began shaking, and Plaintiff sought emergency treatment. (Tr. 974). Her husband reported that, on the way to the hospital, Plaintiff continued to shake and struck herself in the face. (Tr. 974). Dr. Ermak observed that "[d]uring the examination, [Plaintiff] multiple times shakes her head side to side and says 'see here, it's staring again.' These movements last for seconds and then go away as I distract the patient." (Tr. 975). Dr. Ermak assessed Plaintiff with "non-specific nonepileptic intermittent movements of her head, extremities, and trunk." (Tr. 975). Dr. Ermak further stated that "[a]t this time, [Plaintiff's] movements do not appear to be generated from a seizure focus of any kind based on the events witnessed by myself in the emergency department. These appear to be consciously driven." (Tr. 975). Dr. Ermak's observations and conclusions were approved by Dr. Gill. (Tr. 976).

On April 13, 2011, Plaintiff sought emergency treatment for "shakiness" after she fell at home. (Tr. 971). Dr. Cortes, under the supervision of Dr. Fischer, observed that her head moved from side to side, but all examination findings were normal and the movement ceased when Plaintiff was distracted. (Tr. 971–72). Drs. Cortes and Fischer gave a presumptive diagnosis of "movement disorder versus factitious disorder." (Tr. 972).

On April 14, 2011, Drs. Riggins and Wicklund referred Plaintiff to Dr. Subramanian who examined Plaintiff for a possible movement disorder. (Tr. 969). Dr. Subramanian noted that:

> There are extensive records provided to me by the way of the electronic records here at the Hershey Medical Center, which documents multiple episodes of admission to the Hershey Medical Center ED and evaluation by numerous physicians here at Hershey Medical Center ... on multiple admissions.... Rest of the history is well summarized in the previous records available here at the Hershey Medical Center including extensive workup, laboratory studies, which have all been essentially negative.

(Tr. 969). Dr. Subramanian also noted that Plaintiff:

> has had chronic depression and panic attacks from 1990 onwards and she has changed her medication via other psychiatrist at least 5 times every year on satisfactory resolution of symptoms. More recently, in the last 6 months or so, due to continued stress from her daughter's illness, patient also has decompensated.

(Tr. 969). Dr. Subramanian noted that despite Plaintiff's allegation that she fell several times a week, prior examination findings were unremarkable. (Tr. 969). He recorded completely normal neurological findings, including normal sensation, normal gait, negative Romberg sign, and negative finger-to-nose and heel-to-shin tests. (Tr. 969). He opined:

> I do not believe this is any form of neurodegenerative disorder. The patient has clear-cut evidence of untreated or poorly treated depression, and she now has considerable stressors in her

life that would easily explain the ongoing neuropsychiatric illness. I think her best bet is to get aggressive psychiatric treatment in eluding psychotherapy and perhaps involvement of posttraumatic stress disorder counseling. This requires concerted effort to improve. I don't think there is any evidence that the patient has any neurological illness at the present time. I am not even certain that she needs further neurological workup of any kind or even followup of any kind. The overt clinical manifestations of her symptoms, which include falling and trashing around, pounding the ground with her hand, head shaking side-to-side do not represent an organic illness in my opinion. She clearly doesn't have it while I was examining and there is no clear stigmata of any neurological illness. She has had numerous admissions, numerous workups, and I think at this point, no further workup is indicated as the yield is highly unlikely to be of any use. This was discussed with the husband and the patient. Patient has agreed with me. She thought that her symptoms could not be due to depression and that she sought another diagnosis. I advised her that she is welcome to seek another opinion from another doctor and if she needs any referral, I would be more than happy to provide her. But in my opinion, she does not have an organic illness and she does not need any further workup for her presumed illness at the present time. I have not scheduled a followup with her. I do not intend to follow her in my clinic. No further communication on this patient's neurological or what is considered neurological illness is warranted with my office.

(Tr. 969–70).

On May 29, 2011, Plaintiff went to the walk-in clinic for treatment of a leg wound as a result of wrestling a knife away from her sleepwalking daughter. (Tr. 1028).

On June 6, 2011, Dr. Riggins noted that Plaintiff failed to appear for a follow-up examination. (Tr. 1026).

July 25, 2011, Plaintiff sought treatment for a "cyst-like mass above her vaginal hood." (Tr. 1024). Upon examination, Dr. Silvis observed that Plaintiff appeared to have a soft tissue mass superior to her vaginal hood, determined that it was possibly an early infectious process and prescribed antibiotics. (Tr. 1024).

On December 21, 2011, Plaintiff sought treatment for an upper respiratory infection. (Tr. 1018). On January 11, Plaintiff returned because her cough was not improving and Ms. Yevtukh observed normal findings and assessed Plaintiff to have a cough. (Tr. 1018).

January 16, 2012, and January 25, 2012, Plaintiff sought outpatient treatment for breast discharge. (Tr. 1014–1017).

On April 24, 2012, Ms. Yevtukh recorded benign findings after examining Plaintiff for dizziness. (Tr. 287–88, 1315–18). Without any previous examinations or medical observations noting the existence of any bruising, Ms. Yevtukh indicated that Plaintiff had a "bruising tendency" (Tr. 288, 1316), (a remark which appears to be quoted later by Dr. Truong in a letter dated July 16, 2012 (Tr. 321)).

On April 24, 2012, Plaintiff went to Hershey Medical Center because of dizziness. (Tr. 1315). Plaintiff complained that the dizziness was constant and was exacerbated by emotional stress, exertion, and sleep deprivation. (Tr. 1315). Plaintiff reported neck pain, joint pain, muscle pain, and decreased range of motion. (Tr. 1316). Plaintiff reported suffering from moderate radiating pain in her back, had an unsteady gait, was not coordinated, and was not able to balance on her left leg or right

leg. (Tr. 1316). Plaintiff also exhibited confusion. (Tr. 1318).

On April 24, 2012, Ms. Yevtukh completed a physical Residual Functional Capacity (RFC) questionnaire. (Tr. 1245). Ms. Yevtukh indicated that she has seen Plaintiff every six months for the last two years. (Tr. 1245). Ms. Yevtukh wrote that Plaintiff's diagnoses included dizziness and visual disturbance, which she also included as Plaintiff's symptoms along with unstable gait, and fatigue. (Tr. 1245). She gave no opinion regarding her prognosis, noting, "I am not a neurologist," and further noted that Plaintiff was examined by a neurologist who found no cause for her symptoms. (Tr. 1245). Ms. Yevtukh wrote that Plaintiff reported constant left eye pain of nine out of ten with ten indicating the most severe pain. (Tr. 1245).

In response to the question of whether Plaintiff's impairments' have lasted or could be expected to last at least twelve months, Ms. Yevtukh replied that she did not know, and later stated that the earliest that Plaintiff's symptoms and limitations developed was ten months ago. (Tr. 1245, 1248). Ms. Yevtukh checked sections of the form indicating that Plaintiff was not a malingerer and that depression, anxiety, and somatoform disorder affects Plaintiff's physical condition. (Tr. 1245). In response to the question of whether Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation, Ms. Yevtukh indicated "no" and explained, "I do not manage her depression." (Tr. 1246). Without further explanation, Ms. Yevtukh indicated that Plaintiff was incapable of "low stress" jobs. (Tr. 1246).

She indicated that Plaintiff: 1) could walk two to three city blocks without rest or severe pain; 2) could sit for up to an hour and ten minutes at one time and less than two hours in an 8–hour day; 3) could stand for up to an hour and forty-five minutes at a time or up to two hours in an 8–hour day; 4) needs to walk around every forty-five minutes for at least fifteen minutes at a time; 5) needs change positions throughout the day; 6) take unscheduled breaks; 7) requires the occasional use of a cane; 8) could lift up to ten pounds; 9) and she had various postural and upper extremity limitations. (Tr. 1246–48). Finally, Ms. Yevtukh opined that Plaintiff's impairments or treatment would cause her to be absent from work more than four days a month. (Tr. 1248).

On May 25, 2012, Plaintiff sought medical treatment for vision loss and loss of consciousness. (Tr. 1286, 1293). She also reported that she heard several voices, one of which told her to jump out the window after a particularly difficult day with her daughter. (Tr. 1286). Examination revealed normal neurologic and mental status findings. (Tr. 1287). A CT scan of Plaintiff's brain revealed no acute intracranial abnormality. (Tr. 1300).

### 3. Wal–Mart Vision Center

In April 2012, Plaintiff sought treatment for blurry vision and was diagnosed with cortical blindness and cortical abrasion. (Tr. 1244).

### 4. PA Eye Surgery Center

In a treatment record dated May 4, 2012, Plaintiff reported that her left ear started hurting in 2011, and then vision gradually decreased for a year and went totally black since January 2012. (Tr. 1270). Plaintiff reported that she would experience double vision and have episodes of vision going black; all day dizziness for a year; balance issues, walking into things, and tripping for two weeks; dull, aching, sharp, shooting, irritated and "scratching" left eye; and, examination revealed normal results. (Tr. 1271). Plaintiff was diagnosed with a non-physiological visual loss

and advised to undergo a complete evaluation with her psychiatrist, Dr. Nguyen. (Tr. 1271).

5. **Philhaven Hospital: Cary Habegger, Ph.D.; Nhien Nguyen, M.D.; Mustafa Kaleem, M.D.; Moira, M.A.; Marlene K. Hess, R.N.C., B.S.N.; Jeremy Walters, M.D.; Better Amarante, B.A.; Dale Brickley, Ph. D., L.P.C.; Thomas L. Fenstermacher, M.D.**

On November 4, 2010, just before her onset date, Plaintiff sought outpatient psychiatric treatment at Philhaven Hospital because she had been experiencing increasing depression, panic attacks, and nightmares. (Tr. 1233). She demonstrated depressive symptoms of difficulty sleeping, loss of appetite, fatigue, crying spells, hopelessness, and irritability. (Tr. 1233). She also reported experiencing auditory and visual hallucinations. (Tr. 1233). The mental status examination described her mood as being depressed and affect as being tearful and restricted. (Tr. 1235). Plaintiff was diagnosed with major depressive disorder and posttraumatic stress disorder. (Tr. 1235). She was assigned a GAF of 50. (Tr. 1235).

On November 4, 2010, Plaintiff underwent an interdisciplinary evaluation with Ms. Amarante, Dr. Brickley, and Dr. Fenstermacher. (Tr. 1233–36). Plaintiff referred herself for the appointment because in the past three months, she was experiencing increasing depression, panic attacks, and nightmares. (Tr. 1233). Plaintiff reported experiencing fatigue, crying spells, hopelessness, and irritability. (Tr. 1233). Plaintiff reported a depressed mood of ten out of ten where ten indicates the greatest severity. (Tr. 1233). Plaintiff also reported manic symptoms approximately one to two times per month where she will stay up all night, cook with decreased need for sleep, and experienced racing thoughts. (Tr. 1233). Plaintiff reported having daily panic attacks lasting five to ten minutes which included chest pain, shortness of breath, sweating, numbness, and heart palpitations. (Tr. 1233).

Plaintiff reported that she called 9–1–1 several times in the past year because her panic attacks lasted for a prolonged period of time and would not end. (Tr. 1233). Plaintiff reported experiencing auditory and visual hallucinations and for the past two months she has been hearing her deceased grandmother saying "It's going to get better" and seeing her at her bed. (Tr. 1233). Plaintiff also reported experiencing paranoia and stated " 'I'm always feeling someone is watching me.' " (Tr. 1233). Plaintiff also described suicidal ideation, however, indicated that she did not want to die because she wanted to be there for her children. (Tr. 1233). Plaintiff reported that when she was five, she was abused by her biological father. (Tr. 1233). Plaintiff said that she reported this abuse when she was sixteen-years-old, telling the police that her grandfather had abused her. (Tr. 1234). Plaintiff stated that when her grandfather died in prison, her father confessed that he was the one who was the perpetrator. (Tr. 1234).

Plaintiff was diagnosed with major depressive disorder, recurrent, severe, without psychotic features; diagnosed with posttraumatic stress disorder; and, assessed with a GAF score of 50. (Tr. 1235). The interdisciplinary team noted that Plaintiff had been prescribed different psychiatric medications by her family doctor with little benefit from the medication, however, recommended that she remain on the most recent medication to determine if it will become effective over time. (Tr. 1235–36).

In a report dated December 12, 2010, Plaintiff stated that she still had panic attacks twice a day and had a history of

going to the ER about ten times due to panic attacks. (Tr. 742). Plaintiff reported that she blacked out twice in one day and was sent to the ER and stopped breathing several minutes. (Tr. 742). Plaintiff reported having a heart attack in 2001 and has undergone tests with no evidence of arrhythmia. (Tr. 742).

Plaintiff reported that she experienced symptoms panic attacks including shortness of breath, hyperventilation, sweaty palms, pressure in chest, numbness/tingling throughout her entire body, and an inability to move. (Tr. 741). Plaintiff reported a history of suicide attempts at the age of seventeen by slashing her wrists twice. (Tr. 741). Plaintiff also reported a history of sexual abuse by her grandfather when she was five-years-old, that she testified when she was sixteen-years-old, and he was incarcerated for six months. (Tr. 741, 744). Plaintiff reported experiencing nightly nightmares about her physically abusive ex-boyfriend. (Tr. 744).

In a treatment record dated February 21, 2011, Dr. Nguyen noted that Plaintiff had problems with vertigo, syncope, diplopia, and neck pain. (Tr. 740). Plaintiff reported that she had the same bad dreams about her ex-boyfriend, however, had no auditory or visual hallucinations, no paranoia, no suicidal or homicidal ideation, and that she tries to calm herself when she becomes angry. (Tr. 740). Plaintiff reported that her vision had returned to normal and she was doing better. (Tr. 740).

In a treatment record dated May 26, 2011, Dr. Nguyen noted that Plaintiff slept during the day and experienced suicidal thoughts. (Tr. 1055). In another treatment record dated May 26, 2011, Plaintiff reported that her aunt died unexpectedly a week ago, that she has been sleeping poorly due to nightmares of abuse, and experienced panic attacks a few times a day.

(Tr. 1056–57). Plaintiff reported that relatives told her that last week she talked to people who weren't there, she wanted to leave but the people would not let her, and she "snapped out of that" about thirty minutes later not knowing her husband, children or other people who were there. (Tr. 1057). Plaintiff recalled seeing a vision of a woman a few months ago who said something to her and also reported thoughts of death but would not act on it because of her children. (Tr. 1057).

In a treatment record dated June 22, 2011, Plaintiff reported sleeping five hours at night, reported anxiety with panic attacks a few times a week with palpitations, hyperventilation, sweating, tingling sensations, and change in vision. (Tr. 1054). Plaintiff reported nightmares every night, auditory hallucinations of someone talking to her and calling her name, and paranoia. (Tr. 1054).

In a treatment record dated June 21, 2011, Plaintiff said that she was raped by her maternal grandfather when she was five-years-old, he went to jail for six months and later confessed that he raped Plaintiff's mother at the age of nine and was also Plaintiff's father. (Tr. 1041). Plaintiff lived in a group home from the age fifteen to eighteen. (Tr. 1041).

After the initial denial of disability benefits on June 21, 2011, (which noted that Plaintiff never sought inpatient psychiatric treatment (Tr. 432)), on July 11, 2011, Plaintiff voluntarily admitted herself for inpatient treatment at Philhaven Hospital due to depression and suicidal ideation. (Tr. 1058). Plaintiff reported that this was her first inpatient psychiatric hospitalization. (Tr. 1059). Plaintiff indicated that she smoked crack cocaine daily from 2000 to 2004, spending a maximum of $1000 (unspecific as to the period for which this amount of spending applied), and ultimately "stopped cold." (Tr. 1059, 1067, 1071,

1074, 1096, 1234). Plaintiff denied any current alcohol or drug use. (Tr. 1059). Plaintiff stated that her parents divorced when she was two-years-old, she has one older brother and an older sister, and has not contacted her father for three years. (Tr. 1070). Plaintiff reported a history of being on probation for writing bad checks. (Tr. 1073). When assessing Plaintiff's symptoms within the past thirty days, Plaintiff indicated "rash and/or itching skin," however, did not indicate the box for bruising. (Tr. 1081). In an admission "fall risk" intake form, a registered nurse indicated that Plaintiff did not need any ambulatory aid and her gait was normal. (Tr. 1099).

During the July 2011 inpatient treatment, Plaintiff reported experiencing increased depression and having the urge to cut her wrists. (Tr. 1058). Upon admission, Plaintiff was assessed with a GAF score of 35. (Tr. 1058). Plaintiff stated that although she had been seeing a psychiatrist and taking her medication, she continued to feel very depressed. (Tr. 1059). Plaintiff reported experiencing PTSD symptoms, including dreams about past abuse, increased agitation, and depression when she thinks about the past. (Tr. 1059). Dr. Kaleem noted that Patient had:

> developed dissociative episodes in which she would black out and not know where she was or what she was doing. It was reported that she had presented to the Hershey Medical Center in February of 2011 with complaints of blindness in both eyes, some type of paralysis, and an inability to walk well. After an exhaustive investigation, no cause was found, and it was concluded that this was more of a conversion reaction. She had then been referred back to her psychiatrist.

(Tr. 1059). Plaintiff reported significant financial difficulties including the recent finalization of her filing for bankruptcy. (Tr. 1059). Plaintiff reported she was having auditory and visual hallucinations of deceased relatives and converse with them. (Tr. 1059). Plaintiff reported hearing voices of her two deceased relatives telling her to "get help." (Tr. 1094, 1101). It was noted that Plaintiff started seeing a psychiatrist about one year ago and prior to that, had been taking medication prescribed by her primary care physician. (Tr. 1059).

Dr. Kaleem observed that Plaintiff was anxious, depressed, and with a blunted affect. (Tr. 1059). Dr. Kaleem noted that her mood was spontaneous and goal-directed, that she was alert and oriented times three and her insight and judgment were fair. (Tr. 1059).

On July 14, 2011, Dr. Kaleem determined that Plaintiff was stable for discharge and assessed Plaintiff with a GAF score of 50. (Tr. 1060). At the end of the inpatient treatment, Plaintiff was able to list coping skills she could use in the future, she tolerated her medication well, and reported she was no longer having any auditory hallucinations. (Tr. 1060).

On July 15, 2011, Plaintiff entered Philhaven's intensive outpatient program and was discharged August 12, 2011. (Tr. 1145, 1189). In the outpatient admission record, Plaintiff reported that at the age of five, her maternal grandfather raised her and her father disowned her about eight years ago. (Tr. 1189). In the outpatient admission record, it was noted that Plaintiff appeared motivated for treatment. (Tr. 1189). Plaintiff was admitted with a GAF score of 47 and discharged with a GAF score of 53. (Tr. 1145). In the discharge summary signed by Ms. Moore, Ms. Hess, and Dr. Walters, it was noted that during the program, Plaintiff "fixated

on numerous medical symptoms and these triggered her depression even further." (Tr. 1146). It was also noted that Plaintiff's visual and auditory hallucinations decreased. (Tr. 1146). In a treatment record dated July 18, 2011, Plaintiff discussed that her biological father disowned her at birth and would not support her or acknowledge her in life. (Tr. 1228).

On July 19, 2011, Plaintiff reported feeling dizzy in the group and the director consulted the psychiatrist and called for a nurse consult. (Tr. 1209). While waiting for the nurse, the director inquired as to whether Plaintiff had experienced similar episodes, to which Plaintiff explained she had similar episodes and multiple medical check-ups, and indicated that her symptoms were attributed to depression and anxiety. (Tr. 1209). Plaintiff stated that taking a rest helps her calm down. (Tr. 1209).

On July 20, 2011, Plaintiff reported lightheadedness, blacking out, and not remembering what she said or did. (Tr. 1208). On July 22, 2011, Plaintiff reported that she experienced auditory hallucinations the night prior and no visual hallucinations or paranoia. (Tr. 1146). On July 28, 2011, Plaintiff was tearful, reporting that a lump was found in her breast. (Tr. 1146, 1218). On July 28, 2011, Plaintiff also reported no recent auditory or visual hallucinations, no paranoia, and no recent panic attacks. (Tr. 1146). On August 3, 2011, it was noted that Plaintiff continued to have somatic complaints, increased anxiety and depression. (Tr. 1197).

On August 4, 2011, Plaintiff reported experiencing hallucinations again, and feeling lightheaded, dizzy, and passed out. (Tr. 1146, 1207, 1213). It was noted that Plaintiff acknowledged having these symptoms in the past and attributed it to depression. (Tr. 1146). Also on August 4, 2011, Ms. Moore discussed Plaintiff's "ina-

bility to remember to take her medications." (Tr. 1207).

On August 12, 2011, Plaintiff reported improvement and although she recently had a death in the family, she was able to handle it. (Tr. 1146). Although she did not appear hyper in the program, Plaintiff reported feeling hyper at home, cleaning, dancing, and sleeping seven hours. (Tr. 1146). She reported that the medication helped stop the hallucinations and rated her anxiety and depression as a one from a scale where ten indicates the greatest severity. (Tr. 1146–47).

In a treatment record dated August 22, 2011, Dr. Habegger noted that Plaintiff responded reasonably well to treatment and reported a mood of six out of ten with ten representing the best. (Tr. 1040). Plaintiff reported low energy and poor sleep. (Tr. 1040). Plaintiff said that she contacted an attorney regarding disability, and stated that she wished she could work and would like to clean at home and not yell at her two children. (Tr. 1040). In a record dated August 29, 2011, Plaintiff was a "no show" and Dr. Habegger noted that Plaintiff has had a problem with attendance at psychotherapy sessions, Plaintiff had discontinued two previous therapists within the past year, and since beginning treatment on June 21, 2011, Plaintiff had already one late cancelation on August 15, 2011, and a "no show" for the current scheduled session. (Tr. 1039). In a treatment record dated September 13, 2011, Dr. Habegger noted that Plaintiff responded favorably to treatment. (Tr. 1038). Plaintiff reported that family-related stressors triggered anxiety and memories of past abuse. (Tr. 1038). Plaintiff reported a mood of five out of ten. (Tr. 1038).

In a treatment record dated September 19, 2011, Plaintiff reported good sleep and appetite and reported not experiencing anxiety, auditory or visual hallucinations,

but experienced some paranoia of being watched or talked about. (Tr. 1051). Plaintiff reported being depressed without crying spells and reported experiencing nightmares and flashbacks to when someone was hurting her. (Tr. 1051).

In a treatment record dated September 20, 2011, Plaintiff again did not arrive for the scheduled session with Dr. Habegger. (Tr. 1037). In a treatment record dated October 4, 2011, Plaintiff's husband joined her and also staff who worked with Plaintiff for a number of months. (Tr. 1036). Dr. Habegger noted that Plaintiff responded well to treatment and was "getting stronger." (Tr. 1036).

In a treatment record dated November 11, 2011, Plaintiff reported feeling tired, dizzy, and having poor sleep every day. (Tr. 1050). Plaintiff reported nightmares twice a week, flashbacks of her childhood rape three times a week, and Plaintiff heard voices the week prior. (Tr. 1050). Plaintiff also reported experiencing two panic attacks recently and experiencing paranoia, thinking that people were watching her, talking about her, and following her. (Tr. 1050).

In a treatment record dated November 15, 2011, Plaintiff reported a flashback of rape from years ago was triggered by an annual pap-smear test the day prior. (Tr. 1035). Dr. Habegger noted that Plaintiff responded favorably to treatment. (Tr. 1035).

In a treatment record dated December 5, 2011, Plaintiff reported hearing voices of deceased family members at night for the last two weeks and sometimes during the day. (Tr. 1048). Plaintiff reported experiencing some paranoia of being watched, reported feeling depressed and cried sometimes. (Tr. 1048).

In a treatment record dated January 4, 2012, Plaintiff reported not sleeping well, experiencing bad dreams every night, increased appetite, and hearing voices daily with Plaintiff answering the voices. (Tr. 1045). Plaintiff reported daily paranoia of being watched or followed and panic attacks. (Tr. 1045). In a treatment record dated January 17, 2012, Dr. Habegger noted that Plaintiff had an improved mood of eight out of ten. (Tr. 1034). In a treatment record dated January 31, 2012, Plaintiff reported a little improvement with her dreams, hearing voices every other day of someone talking, and some paranoia. (Tr. 1044).

In a treatment dated February 7, 2012, Dr. Habegger noted that Plaintiff responded reasonably well given her courage to talk about difficulties and reported a mood of five out of ten. (Tr. 1033). Plaintiff reported difficulties sleeping and feelings regarding not contributing at all at home, however, her husband pointed out that she cooks and helped her daughter get therapy. (Tr. 1033). In a treatment record dated February 18, 2012, Plaintiff reported poor sleep, nightmares, having daily flashbacks, and panic attacks with shortness of breath, hyperventilation, and numbness of hands three times a week. (Tr. 1043). Plaintiff reported that she hears voices of people talking and experiences paranoia. (Tr. 1043).

On April 9, 2012, Plaintiff sought inpatient treatment due to depression with suicidal ideation. (Tr. 1237). It was reported that Plaintiff wrote a suicide note and planned to overdose on medications. (Tr. 1237). Plaintiff was admitted with a GAF score of 25. (Tr. 1237). Plaintiff reported experiencing visual hallucinations of deceased family members and the devil, as well as command auditory hallucinations that would tell her to harm herself. (Tr. 1237). The mental status examination at the time of her admission found that her mood was severely depressed and affect

was blunted. (Tr. 1238). Plaintiff underwent a physical exam and heart, extremities, back, range of motion, gait, sensory, motor functions, and cranial nerves were all normal. (Tr. 1241–42). Plaintiff was discharged with a GAF score of 55. (Tr. 1237).

A treatment record dated May 15, 2012, Plaintiff reported to Dr. Nguyen, that she suffered from nightmares and poor sleep every night, flashbacks, daily panic attacks, and daily auditory hallucinations of voices telling her what to do. (Tr. 1269). Plaintiff reported suicidal ideation but able to not act upon it. (Tr. 1269).

### 6. Louis Laguna, Ph.D., State Agency Consultative Examination

On June 7, 2011, Dr. Laguna observed that Plaintiff appeared guarded and irritated during the interview, but her appearance was otherwise unremarkable. (Tr. 957). Dr. Laguna observed that Plaintiff was "generally cooperative but certainly had AXIS II characteristics that came through on a number of occasions." (Tr. 959). Plaintiff reported that she last worked about five years ago as a laborer and held that position for about 4 years. (Tr. 956). Plaintiff indicated that she left that job because of conflict she was having with her husband at the time. (Tr. 956). Plaintiff reported that the longest job she ever maintained was when she worked for Power Logistics for just over 4 years. (Tr. 956). Plaintiff reported that she had never been hospitalized psychiatrically, and had never seen a therapist, although she saw a psychiatrist who prescribed medication. (Tr. 957). With regard to activities of daily living, Plaintiff reported that she was able to cook, clean, shop, take care of her own personal care, health, and hygiene. (Tr. 960).

Plaintiff reported that she was raised by her biological mother and grandparents while her father was in and out of the picture. (Tr. 957). Dr. Laguna wrote:

[Plaintiff] described a tough life growing up and told me "I was raped at 5 but I put the wrong man behind bars." She then went on to tell me that at the age of 5 years old she was raped and apparently led investigators to believe that the person who raped her was her grandfather. She said that her grandfather went away to prison on these charges but it was later determined that it was not her grandfather but rather biological father who raped her. She indicated that there were lots of other traumas that she related to having an alcoholic mother.

(Tr. 958). Plaintiff reported that she had learning support classes throughout high school and after graduation, worked as a grocery bagger and then worked as a full-time laborer. (Tr. 958). She reported a prior history of crack cocaine abuse which she stopped five years ago without any relapses. (Tr. 958). Plaintiff reported that her ex-husband of eleven years was physically abusive, threatened to kill her, and on one occasion held a gun to her and told her to call the kids to say goodbye to them. (Tr. 958). Plaintiff reported that her subsequent marriage was supportive. (Tr. 958).

Dr. Laguna noted that Plaintiff made comments such as "just last night I thought I would kill myself, maybe I will," however, when Dr. Laguna inquired further about these statements she would "renege and clarify that it was just a feeling and that she had no plans of doing so." (Tr. 959). Plaintiff described her mood as 'snappy' and said that she gets frustrated easily and that she screams and yells at her husband and her children. (Tr. 959). According to Dr. Laguna, "[Plaintiff] endorsed all symptoms of depression to an extreme degree; however, I do believe that she meets criteria for Major Depres-

sive Disorder." (Tr. 959). Dr. Laguna concluded that Plaintiff met the criteria for PTSD of a mild to moderate severity reporting evidence of flashbacks and "psychophysiological alarm states" which directly relate to her traumatic experiences. (Tr. 959). Dr. Laguna observed that there was also emotional numbing and reported dissociative experiences surrounding these traumas. (Tr. 959). Plaintiff denied hallucinations or delusions. (Tr. 959).

Dr. Laguna opined that Plaintiff's thought processes, her productivity, continuity, and language were generally intact. (Tr. 959). Dr. Laguna observed that Plaintiff was able to think abstractly; had a poor capacity for calculating serial threes and made an error immediately at the number 95 and then got frustrated and gave up. (Tr. 959). Plaintiff reported that her memory was "not very good; I remember all the bad things." When Dr. Laguna assessed her memory, Plaintiff's recent, recent past, and remote memory were generally intact. (Tr. 959). Mental status examination revealed fair insight and judgment. (Tr. 959). Dr. Laguna diagnosed Plaintiff with major depressive disorder, recurrent without history of psychotic features; PTSD, mild to moderate severity; and personality disorder, not otherwise specified, Cluster B traits [9]; and assessed Plaintiff's Global GAF score at 50. (Tr. 960). Dr. Laguna stated that her ability to respond appropriately to supervision, co-workers, and work pressures are affected by a combination of a depressed mood, a personality disorder, and her fixation on somatic complaints. (Tr. 953).

### 7. Roger Fretz, Ph.D., State Agency Non–Examining Opinion

In June 2011, Dr. Fretz reviewed the record and completed a psychiatric review

technique form and mental RFC assessment. (Tr. 429–31). Dr. Fretz reviewed the June 2011 opinion of Dr. Laguna, records from Philhaven Hospital received April 2011, Plaintiff's work history records, Plaintiff's function report, records from Hershey Medical Center received March 2011, records from Good Samaritan Hospital received March 2011, and a record indicating that Plaintiff did not take special education courses. (Tr. 427–28).

Dr. Fretz acknowledged that Plaintiff "was eventually discharged with diagnosis of an undifferentiated somatoform disorder presenting with symptoms of [bilateral] vision loss likely secondary to [major depressive disorder], anxiety and PTSD." (Tr. 429). Dr. Fretz opined that Plaintiff's medically determinable illnesses were affective disorders under impairment code 2960 (Listing 12.04) and anxiety disorders under impairment code 3000 (Listing 12.06). (Tr. 429). Notably, even after noting that Plaintiff was previously diagnosed with undifferentiated somatoform disorder, Dr. Fretz did not write impairment code 3060 (Listing 12.07) to endorse a somatoform disorder as a medically determinable illness. (Tr. 429).

Dr. Fretz noted that Plaintiff's treatment was limited to being prescribed psychoactive medications, and Plaintiff was not treated by psychotherapy or inpatient hospitalization. (Tr. 432). Dr. Fretz observed that Plaintiff "was not fully cooperative" during the examination with Dr. Laguna and that Dr. Laguna "indicated his impression that she was overstating her level of dysfunction" and indicated that her reported level of dysfunction was not sup-

---

**9.** The Cluster B personality disorders are antisocial, borderline, narcissistic and histrionic. *Sharpe v. Colvin*, No. 1:14–CV–00779, 2015 WL 574623, at *8 n. 23 (M.D.Pa. Feb. 11,

2015); DSM–IV–TR at 117 ("The essential feature of histrionic personality disorder is pervasive and excessive emotionality and attention-seeking behavior.").

ported by the evidence. (Tr. 432). Dr. Fretz opined that Plaintiff was able to engage in social settings, that her "ability to attend and concentrate" was not significantly restricted, and that she had no apparent memory difficulties. (Tr. 432). Dr. Fretz opined that the opinion from Dr. Laguna was "somewhat consistent with the overall medical record in that he underestimated Plaintiff restrictions in finding no restrictions secondary to mental impairments". (Tr. 432).

Dr. Fretz opined that Plaintiff had mild restriction of activities of daily living; moderate difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. 429). In his RFC assessment, Dr. Fretz opined that Plaintiff's ability to interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriately behavior, and adhere to the basic standards of neatness and cleanliness were not significantly limited; and her ability to accept instructions and respond appropriately to criticism from supervisors and get along with coworkers or peers without distracting them or exhibiting behavioral extremes was moderately limited. (Tr. 431). Finally, Dr. Fretz opined that Plaintiff could understand and perform simple tasks. (Tr. 432). After considering the total medical and non-medical evidence in the file, Dr. Fretz found Plaintiff to be partially credible. (Tr. 430, 441).

### 8. Special Education Records— Lebanon Senior High School

A document dated March 16, 2011, from the office of special education records for Plaintiff's former high school indicated "Not special ed. No records!" (Tr. 951). The document identified Plaintiff with her social security number and with her recent married name change of Weidman. (Tr. 951).

### IV. Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

[H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir.1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant

from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir.2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir.2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir.1999) (quoting

*Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995)), and may be less than a preponderance. *Jones*, 364 F.3d at 503. If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.1999); *Johnson*, 529 F.3d at 200.

## A. Whether a Somatoform Diagnosis and Adverse Credibility are Mutually Exclusive

A preliminary issue of first impression before the Court is whether it is error for an ALJ to make an adverse credibility finding when a claimant has been diagnosed with a somatoform disorder (a diagnosis which requires a determination regarding malingering) and when the ALJ determined that the somatoform disorder was a severe impairment under step two. Plaintiff asserts that because Plaintiff was diagnosed with a somatoform disorder, "the ALJ should have undertaken a more delicate credibility analysis" and that the ALJ erred in dismissing "all of [Plaintiff's] subjective complaints without doing legally correct analysis of Plaintiff's symptoms." Pl. Brief at 2, 11–12. Plaintiff further argues that the "ALJ decision implies that despite [Plaintiff] being diagnosed with somatoform disorder by psychiatrist, she is not actually experiencing these symptoms at all." Pl. Brief at 12.

Credibility is the cornerstone of any diagnosis which depends on solely the subjective symptoms of an individual. *See e.g.*, 3 Soc. Sec. Disab. Claims Prac. & Proc. § 25:4 (2nd ed.); *cf., Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000) (citation omitted) (observing that medical professionals often must rely upon a patient's self-reported history and where

the patients' reports are inaccurate, those inaccuracies can be explored through cross-examination). The importance of credibility is exceptionally true for somatization and undifferentiated somatoform disorders where their diagnostic criteria explicitly require a finding that the reported symptoms are "not intentionally produced or feigned (as in Factitious Disorder or Malingering)." *See* Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM–IV–TR) at 485, 489, 491–92 (2000).[10] The diagnostic criteria for Undifferentiated Somatoform Disorder require:

A. One or more physical complaints (e.g., fatigue, loss of appetite, gastrointestinal or urinary complaints).

B. Either (1) or (2):

(1) after appropriate investigation, the symptoms cannot be fully explained by a known general medical condition or the direct effects of a substance (e.g., a drug of abuse, a medication)

(2) when there is a related general medical condition, the physical complaints or resulting social or occupational impairment is in excess of what would be expected from the history, physical examination, or laboratory findings

C. The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D. The duration of the disturbance is at least 6 months.

E. The disturbance is not better accounted for by another mental disorder (e.g., another Somatoform Disorder, Sexual Dysfunction, Mood Disorder, Anxiety Disorder, Sleep Disorder, or Psychotic Disorder).

F. The symptom is not intentionally produced or feigned (as in Factitious Disorder or Malingering).

DSM–IV–TR at 492. "In contrast to Undifferentiated Somatoform Disorder, the physical symptoms of Factitious Disorders [11] and Malingering [12] are intentionally

---

10. The same reasoning extends to other similar psycho-somatic disorders such as conversion, psychogenic, somatization, pseudoseizures, and pain disorder associated with psychological features.

11. The motivation in Factitious Disorder "is a psychological need to assume the sick role, as evidenced by an absence of external incentives for the behavior." DSM–IV–TR at 513. The DSM–IV–TR notes that "[i]ndividuals with Factitious Disorder usually present their history with dramatic flair, but are extremely vague and inconsistent when questioned in greater detail." DSM–IV–TR at 513. Individuals with Factitious disorder manifested through psychological signs and symptoms:

may claim problems such as depression and suicidal ideation following the death of a spouse (the death not being confirmed by other informants), memory loss (recent and remote), hallucinations or delusions, symptoms of Posttraumatic Stress Disorder, and dissociative symptoms. Some individuals

may discern from the examiner's questions the symptoms to endorse during a review of systems. Conversely, they may be extremely negativistic and uncooperative when questioned.

DSM–IV–TR at 514. Whereas individuals with factitious disorder manifested through in physical signs and symptoms may claim "pain ... neurological symptoms (e.g., seizures, dizziness, or blacking out), vomiting, [and] diarrhea....."

DSM–IV–TR at 514–15.

12. The DSM–IV–TR explains that:

[t]he essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs.... Malingering should be strongly suspected if any combination of the following is noted:

produced or feigned." DSM–IV–TR at 492. While the diagnostic criteria require a finding that the symptoms were not produced by malingering, it is possible to for a mixed diagnosis of both undifferentiated somatoform disorder symptoms and malingering to coexist. *See* DSM–IV–TR at 488–89; *see also Carradine v. Barnhart,* 360 F.3d 751, 756–81 (7th Cir.2004) (J. Coffey dissent) (explaining that symptom magnification and somatoform disorder are not mutually exclusive); *Minner v. Am. Mortgage & Guar. Co.,* 791 A.2d 826, 871–72 (Del.Super.2000) (concluding that there is a factual and scientific basis for expert opinion's seemingly inconsistent diagnoses of both Undifferentiated Somatoform Disorder and Malingering). The DSM–IV–TR explains that:

> [s]ymptoms that are intentionally produced should not count toward a diagnosis of Somatization Disorder. However, the presence of some factitious or malingered symptoms, mixed with other nonintentional symptoms, is not uncommon. In such mixed cases, both Somatization Disorder and a Factitious Disorder or Malingering should be diagnosed.

DSM–IV–TR at 488–89. Thus, it is not inconsistent for the ALJ to conclude that Plaintiff had a severe impairment of undifferentiated somatoform disorder *and* conclude that she was not entirely credible and feigned or exaggerated the severity of her symptoms. *See* DSM–IV–TR at 488–89; *see also Carradine v. Barnhart,* 360 F.3d 751, 756–81 (7th Cir.2004) (J. Coffey dissent); *Minner v. Am. Mortgage & Guar. Co.,* 791 A.2d 826, 871–72 (Del.Super.2000). *But see Jackson–Farnsworth v. Colvin,* No. CIV.A. 12–2516–JWL, 2014 WL 1260122, at *9 (D.Kan. Mar. 27, 2014).

Moreover, the absence of a malingering conclusion from medical records is not probative as to whether a claimant suffers from a somatoform disorder nor is a malingering conclusion from a medical expert required for an ALJ's adverse credibility determination to be supported by substantial evidence. *See e.g., Iulian Iancu, M.D., et al., Attitudes Towards Malingering: A Study Among General Practitioners and Mental Health Officers in the Military,* 22 Med. & L. 373, 37475 (2003) ("Clinicians are reluctant to make the diagnosis of malingering and hence underreport it. They are disinclined to label patients as malingerers and may find it distasteful to call an evaluee a liar, while concerns of legal liability also exist. Finally, physicians might be afraid of the possible violence should the deceiver's scheme be dismantled" (internal citation omitted)); POMS No. DI 22510.006(D) (directing ALJs not to purchase malingering tests as part of a consultative examination for mental impairments because "[t]ests cannot prove whether a claimant is credible or malingering because there is no test that,

1. Medicolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination)
2. Marked discrepancy between the person's claimed stress or disability and the objective findings
3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen
4. The presence of Antisocial Personality Disorder

Malingering differs from Factitious Disorder in that the motivation for the symptom production in Malingering is an external incentive, whereas in Factitious Disorder external incentives are absent. Evidence of an intrapsychic need to maintain the sick role suggests Factitious Disorder. Malingering is differentiated from Conversion Disorder and other Somatoform Disorders by the intentional production of symptoms and by the obvious, external incentives associated with it. In Malingering (in contrast to Conversion Disorder), symptom relief is not often obtained by suggestion or hypnosis.

DSM–IV–TR at 739–40.

when passed or failed, conclusively determines the presence of inaccurate self-reporting"). There are significant disincentives for a health professional to conclude that his or her patient is malingering, such as exposure to legal liability,[13] disruption of the therapeutic trust with a patient, or belief that a malingering label would cause more harm than referring a patient to seek psychiatric treatment. *See e.g.*, Iulian Iancu, M.D., *et al., Attitudes Towards Malingering: A Study Among General Practitioners and Mental Health Officers in the Military*, 22 Med. & L. 373, 374–75.[14] Given the above-described disincentives of mental health providers to directly state a patient is malingering, and given that a diagnosis of somatoform can coexist with a finding of malingering, a diagnosis of somatoform alone is insufficient to infer a plaintiff's credibility and has little probative value without an explanation for the diagnosis, particularly an explanation that acknowledges existing medical evidence of voluntarily produced symptoms. *See* DSM–IV–TR at 488–89, 492, 514–15; 20

C.F.R. §§ 404.1527(c), 416.927(c) (standard for weighing medical opinions includes explanation for the conclusions reach and evidence considered); *see also Medical Evidence*, 2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:116 (2nd ed.) (observing the need for a somatoform diagnosis to be supported by "medical evidence [which] explains the nature of the impairment, its usual manifestations, and how it is generally diagnosed, as well as how the diagnosis was reached in the claimant's case"); *Hamilton v. Chater*, No. CIV. 94–1046–FR, 1995 WL 434360, at *3 (D.Or. July 7, 1995) aff'd, 106 F.3d 407 (9th Cir.1997) (concluding the ALJ gave clear and convincing evidence in rejecting a somatoform diagnosis based, in part, that the diagnosing doctor did not expressly consider malingering as a possibility as required by the Diagnostic and Statistical Manual of Mental Disorders before making his diagnosis).

Ultimately, it is the administrative law judge's job to resolve conflicting medical

13. *See e.g., Wagner v. Future Planning Associates, Inc.*, No. CIV.A 09–971, 2010 WL 528437, at *5 (W.D.Pa. Feb. 11, 2010) (involving litigation against a physician who opined that claimant was able to return to work and was malingering, an opinion resulting in termination of medical benefits and lost wages).

14. *See also* Frank R. Sparadeo, Ph.D., *Malingering Tests: What They Are, What They Are Not*, Ann.2004 ATLA–CLE 2313 (July 2004) ("To opine that a plaintiff is malingering is a very bold statement with far-reaching implications (i.e. medicolegal, personal, and economic). The opinion that a person is feigning illness or significantly exaggerating risks lawsuits (e.g., defamation of character) and even personal danger. In Australia, in 1955, three of the four surgeons who labeled a patient a malingerer were shot and two were killed (Parker, 1979). [E]ven the courts are reluctant to label individuals as malingerers."); *Malingering*, 2 Attorneys Medical Deskbook § 25:41.10 ("Many clinicians who believe a patient is malingering will not document this

conclusion in their medical record. They fear they could be cross-examined on their competence to "diagnose" malingering, and on the difficulty of establishing any clinical diagnosis by exclusion. Even psychiatrists are reluctant to diagnose malingering, especially in view of that condition not being considered a diagnosis. As a result, they document only that they are unable to find a clinical basis for the patient's symptoms."); Steve Rubenzer, Ph.D., *Malingering · of Psychiatric Problems and Brain Damage in a Personal Injury Setting: Mild Head Injuries and Chronic Pain*, 47 No. 9 DRI For Def. 28 (2005) ("Unfortunately, even when poor effort or malingering is addressed appropriately, unfavorable findings are sometimes obscured". A recent survey of neuropsychologists suggested that many are reluctant to diagnose malingering or to make strong statements on this topic. In one recent case ... the neuropsychologist had definitive evidence of malingering, yet reported his findings in this way: "It is certainly possible that Mr. M may be overly focused on his inability to attend and perform ...").

evidence. *See* 20 C.F.R. §§ 404.1527(c); *Richardson v. Perales,* 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is also within the province of the administrative law judge to make credibility determinations as to a claimant's report of his or her limitations. *See Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983); *see e.g., Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 652 (6th Cir.2009). An ALJ is not bound by a medical source's opinion as to the truthfulness of a claimant's report of symptoms and limitations. *See Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983); *Verduin v. Comm'r of Soc. Sec.,* No. 1:08–CV–698, 2009 WL 3153016, at *3 (W.D.Mich. Sept. 24, 2009) (finding that where a plaintiff argued that doctors had not doubted the truthfulness of her statements regarding her symptoms, such argument lacked merit, concluding that "[c]redibility determinations with respect to subjective complaints rest with the ALJ").[15]

When substantial evidence supports an ALJ's determination that a claimant is less than credible, such a credibility finding can undermine a diagnosis based on subjective symptoms or undermine the severity of the symptoms attributed to the diagnosis. *See e.g., Tyminska v. Soc. Sec. Admin.,* 313 Fed.Appx. 477, 478 (3d Cir. 2008) (upholding ALJ decision where a plaintiff's subjective complaints of disabling psychological symptoms were not fully credible in light of the medical evidence.); *Jackson v. Barnhart,* 120 Fed.Appx. 904, 907 (3d Cir.2005) (upholding the ALJ's adverse credibility determination with a plaintiff diagnosed with depression was based, in part, on the divergence between her subjective reports of incapacity and the record evidence, which suggested that she was functional); *Hamilton v. Chater,* No. CIV. 94–1046–FR, 1995 WL 434360, at *3 at n. 2 (concluding the ALJ gave clear and convincing evidence in rejecting a somatoform diagnosis based, in part, that the diagnosing doctor did not expressly consider malingering as a possibility and the ALJ finding the plaintiff not credible).

Based on the foregoing, the Court concludes that where a claimant has been diagnosed with undifferentiated somatoform disorder and an ALJ concludes that the disorder was a severe impairment, it is legally possible for an ALJ to make an adverse credibility finding.

### B. Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in finding Plaintiff lacked credibility. Pl. Brief at 2, 11–16.

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however,

---

**15.** Although not entirely germane to the role of the ALJ as a factfinder, cases addressing the role of the jury are rooted on similar principles regarding the role of expert testimony in credibility determinations. *See e.g., Coney v. NPR, Inc.,* 312 Fed.Appx. 469, 474 (3d Cir.2009) (citing *United States v. Whitted,* 11 F.3d 782, 785–86 (8th Cir.1993) ("A doctor ... cannot pass judgment on [another witness'] truthfulness in the guise of a medical opinion, because it is the [fact-finder's] function to decide credibility.")); *Hartle v. First-Energy Generation Corp.,* 7 F.Supp.3d 510 (W.D.Pa.2014) ("Expert opinion about the credibility of other witnesses generally is not helpful as it undermines the [fact-finder's] credibility-finding function"); *Kovacic v. Ponstingle,* No. 1:05CV2746, 2014 WL 4715859, at *9 (N.D.Ohio Sept. 22, 2014) ("It is settled that 'a psychiatrist may not testify to the credibility of a witness; that issue is one for the [fact-finder]' "); *Kidd v. Wal–Mart Stores, Inc.,* 2009 WL 3805584, *2–3 (E.D.Va.2009) (citing *Nichols v. American Nat. Ins. Co.,* 154 F.3d 875, 883 (8th Cir.1998)) (opining that experts' opinions that plaintiff's pain was caused in part by symptom magnification (malingering and secondary gain) and a somatoform disorder would invade the province of the fact-finder).

the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96–7p. Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 409 (3d Cir.1979); *accord Snedeker v. Comm'r of Soc. Sec.,* 244 Fed.Appx. 470, 474 (3d Cir.2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR")[16] 96–7p; *Schaudeck v. Comm'r of Social Security,* 181 F.3d 429, 433 (3d Cir.1999).

The credibility finding must be based on a consideration of the entire case record. SSR 96–7p. In determining a claimant's credibility regarding the severity of symptoms, the ALJ must consider the following factors in totality: 1) the extent of daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment other than medication for the symptoms; 6) measures used to relieve pain or other symptoms; and, 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. SSR 96–7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Canales v. Barnhart,* 308 F.Supp.2d 523, 527 (E.D.Pa.2004).

Evidence can be used to discount credibility if such evidence demonstrates a contradiction or inconsistency. *See e.g. Horodenski v. Comm'r of Soc. Sec.,* 215 Fed. Appx. 183, 188 (3d Cir.2007) (finding significant a plaintiff's testimony about her daily activities was internally inconsistent, thus supporting the ALJ's determination of according her testimony little weight); *Smith v. Astrue,* 359 Fed.Appx. 313, 317 (3d Cir.2009) (claimant's testimony that she was essentially bedridden was contradicted by evidence that she had been the primary caretaker for a young child for two years); *see also Orn v. Astrue,* 495 F.3d 625, 636 (9th Cir.2007) (stating that inconsistencies in testimony or between testimony and other evidence is proper reason to discredit a social security plaintiff); *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir.2008) (ALJ erred in making adverse credibility inferences from uncontradicted evidence).

### 1. Consideration of Credibility Factors in Totality

Plaintiff argues that the ALJ failed to address the seven factors required by 20 C.F.R. § 404.1529(c) and Social Security Ruling 96–7p to assess Plaintiff's credibility. Pl. Brief at 15. Plaintiff asserts that "the ALJ only referenced only one of the required factors which is [Plaintiff's] activities of daily living." Pl. Brief at 15. However, Plaintiff failed to enumerate what specific material evidence the ALJ failed to address that would necessitate changing the outcome of the decision. *See* Local Rule 83.40.4(b).[17]

---

**16.** Although SSA rulings do not have the force and effect of a statute or regulation, they are binding on all components of the SSA in accordance with section 402.35(b)(1) of the SSA Regulations (20 C.F.R. § 402), and are to be relied upon as precedents in adjudicating other cases.

**17.** Local Rule 83.40.4(b) requires that in social security cases, a Plaintiff's brief "shall set

forth ... the specific errors committed at the administrative level which entitle plaintiff to relief." M.D. Pa. Local Rule 83.40.1; *cf. Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231–32 (3d Cir.2008) (explaining that Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a 'showing,' rather than a blanket assertion, of entitlement to relief and, as a threshold requirement, the plain statement of pleadings must possess enough heft to show

The Third Circuit has observed that "[a] written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence" and that the ALJ's "mere failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart,* 91 Fed.Appx. 775, 780 n. 7 (3d Cir.2004).

Plaintiff's argument lacks merit. *See* SSR 06-3p ("[T]here is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision."); *Phillips v. Barnhart,* 91 Fed.Appx. 775, 780 n. 7 (3d Cir.2004); *Francis v. Comm'r Soc. Sec. Admin.,* 414 Fed.Appx. 802, 804 (6th Cir.2011) (social security regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons ... not an exhaustive factor-by-factor analysis."). Nevertheless, given the ALJ's abundant evaluation of the evidence, the Court will address the six remaining factors that Plaintiff argues the ALJ had omitted.

With regard to "the location, duration, frequency, and intensity of pain or other symptoms," the ALJ observed that the "record contains several hospital visits for complaints of blacking out, shaking and dizziness.... [Plaintiff] has experienced more than three episodes of decompensation, but none of extended duration." (Tr. 330). The ALJ also observed that:

> [s]ince her alleged onset date, [Plaintiff] has had several increases in symptoms, as seen by her multiple trips to the emergency room for reported black outs, dizziness, shaking episodes and partial blindness. After starting mental health

treatment, [Plaintiff] had two inpatient hospitalizations, each lasting about four days, and also attended a partial program for 12 days where she was able to attend therapy sessions on an outpatient basis.

(Tr. 330–31). The ALJ summarized Plaintiff's testimony noting that Plaintiff "said that these episodes have been lasting for about four years. Physically, [Plaintiff] testified to being blind in her left eye for a couple of months." (Tr. 333). The ALJ noted that Plaintiff "said that she will shake, and she will go into whole body shock that lasts sometimes 10 minutes .... [and] still has these episodes off and on." (Tr. 333). The ALJ noted that Plaintiff "reported constant leg pain and said she does not like to walk or go outside and she does not want to do anything." (Tr. 333). The ALJ noted that:

> [Plaintiff's] falls and black outs will last five to ten minutes. She said that she falls to the ground, her body goes numbs, but she has never hurt herself. "She reported having these spells at least five times a week and does not always go to the hospital, but will go usually one time a week." (Tr. 333).... [Plaintiff] reported at times having thoughts of suicide. She also said that when she comes to after having a black out spell she does not remember anything.

(Tr. 333). The ALJ observed that:

> [Plaintiff] said she will get panic attacks, resulting in shortness of breath but has learned ways to get her symptoms under control. These will sometimes result in a blackout episode. [Plaintiff] stated she has crying spells that happen every day and mood swings occur on a

that the pleader is entitled to relief). Failure to adequately raise an issue results in its waiver. *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.,* 44 F.3d 1194, 1203–04

(3d Cir.1995) (upholding a district court's finding that a party had waived an issue when a party only made vague references to the issue).

weekly basis. She has mostly "bad days," about 15 a month in which she will not change out of her pajamas.

(Tr. 334). The ALJ also noted that in the self-assessment, Plaintiff "reported being in pain when standing and walking, but she did not report an etiology of such pain, what type of pain it was and where the pain was located". (Tr. 343). The ALJ also summarized Plaintiff's husband's testimony regarding Plaintiff's symptoms stating that:

> [Plaintiff's husband] said [Plaintiff] will just fall over, be unconscious, and shake and slap her cheeks. He said they last five to ten minutes. .... [Plaintiff's] husband stated he has taken her to the emergency room for her blackouts, and he estimated she has been to the emergency room about eight times.... He testified he sees the dizziness happening a lot, and that she will have the spells a couple of times a month.

(Tr. 334). The ALJ also summarized several medical records memorializing the frequency and severity of Plaintiff's symptoms:

> Beginning with her alleged onset date, [Plaintiff] complained of her first syncopal episode, as well as associated symptoms of fatigue, dizziness and chest pain....
>
> [Plaintiff] returned a few days later for a follow-up with more complaints of dizziness, fatigue, along with occasional paresthesias in hands, blurred vision, decreased hearing, chest pain and palpitations.... [Plaintiff] was unable to walk on her toes or heels without staggering.....
>
> About one month later, on January 1, 2011, [P]laintiff reported losing consciousness at home, noting it was her third syncopal episode in two months....

On January 20, 2011, [Plaintiff] was seen again ... with complaints of losing her hearing, dizziness, double vision while in the waiting room of the hospital, and she claimed to have nearly passed out. [Plaintiff] was tearful and reported being very dizzy....

...[d]uring the neurological consultation [Plaintiff] reported blurry vision and having difficulty .calculating number of fingers shown to her.

Three days later, [Plaintiff] once again returned to the emergency room and emergency medical services (EMS) noted they found her unresponsive at home.

[Plaintiff's] neurological symptoms continued, as she sought treatment from the emergency room on February 15, 2011, for blindness complaints and subjective decreased sensation over her left face.

[Plaintiff] continued to be seen at Hershey Medical in the emergency room for complaints of syncope, dizziness, blindness, numbness, tingling, tremors, and whole body shaking.

Prior to May of 2011 [Plaintiff] treated sporadically with Philhaven Hospital, and treatment notes revealed only two visits to Philhaven prior to May 2011: the December 2010 visit discussed above and a February 2011 visit where [Plaintiff] reported vertigo, syncope, neck pain, and bad dreams about her abusive ex-boyfriend.

[On June 22, 2011,] Plaintiff reported anxiety, including a few panic attacks that week and her medications were increased.

On July 11, 2011, [Plaintiff], after being referred by her family, was voluntarily admitted to Philhaven Hospital for inpatient treatment

(Tr. 335–38) (internal citations omitted). The ALJ continued:

[Plaintiff] continued treatment at Philhaven, where she reported waxing and waning symptoms of depression and anxiety. "Specifically, at times she reported having depressed mood, paranoia, hearing voices, having panic attacks and bad dreams...." (Tr. 339) (citation omitted).

On April 9, 2012, [Plaintiff] was again voluntarily admitted to Philhaven Hospital for treatment of depression with suicidal ideation, as [Plaintiff] wrote a note and expressed a plan to overdose on her medications. She also reported command auditory hallucinations telling her to hurt herself.

(Tr. 339).

With regard to "precipitating and aggravating factors," the ALJ observed that Plaintiff "testified that her black out spells .... come and go and are triggered by stress." (Tr. 333). The ALJ observed that Plaintiff "also received some treatment for mental complaints of anxiety and depression related to many life stressors" (Tr. 335) and that Plaintiff "reported being overwhelmed by her mentally challenged daughter" (Tr. 339).

With regard to "the type, dosage, effectiveness, and side effects of any medication," the ALJ observed that Plaintiff "reported her medications causes [sic] dizziness when she stands up, blacking out, and weight gain" (Tr. 334), "was to continue the use of Prozac and Klonopin" (Tr. 336), and after reporting suicidal thoughts to a Philhaven examiner, she was "advised to reduced her Risperdal medication" (Tr. 337). The ALJ noted that Plaintiff "testified that the tremors stopped when her medications were changed" (Tr. 330) and in response to her left eye blindness, Plaintiff "said that the doctors said it could be her medication" (Tr. 333). The ALJ wrote that Plaintiff "testified that once she was taken off a depression medication she

stopped shaking, but still has these episodes off and on." (Tr. 333). The ALJ also noted that Plaintiff's "medication regimen was updated, and Abilify was added for her psychosis." (Tr. 340).

With regard to "treatment other than medication for the symptoms," the ALJ observed that after hospitalization starting January 1, 2011, Plaintiff improved with treatment. (Tr. 335). The ALJ also wrote:

[Plaintiff] continued treatment at Philhaven and reported improvement on June 21, 2011....

[Plaintiff] was hospitalized for three days, and she underwent medication management, individual and group therapists and [Plaintiff] improved upon discharge, and her GAF score improved to 50. [Plaintiff] herself noted she felt the medications and therapies helpful and she planted to go to the outpatient partial program upon discharge.

[Plaintiff] did attend the partial program for 12 days, and she was noted as having a GAF of 47 when beginning. During that time her hallucinations decreased, she was more open to talk ... and she underwent therapeutic treatment and noted her anxiety and depression decreased to a one out of 10 on discharge.

(Tr. 338) (internal citation omitted). The ALJ noted that:

[therapy] treatment notes also show [Plaintiff] doing good and having good sleep, appetite, no hallucinations or anxiety and depression and the treatment notes show she responded favorably to treatment. In particular, [Plaintiff] showed improvement through the first four months of 2012, and overall [Plaintiff] was opening up, sharing her feelings, and mainly reported only some symptoms of paranoia, depression, bad

dreams, panic attacks and hearing voices.

(Tr. 339) (internal citation omitted). The ALJ also noted that on April 9, 2012, Plaintiff "was admitted for four days, and underwent therapy, both individual and group. On discharge, she was alert, in a good mood, and no hallucinations were present, although her affect was still constricted." (Tr. 339) (internal citation omitted).

With regard to "measures used to relieve pain or other symptoms," the ALJ observed that Plaintiff "needs to take breaks and naps every day" and "needs reminders for her appointments, dinner and laundry." (Tr. 333–34).

Finally with regard to "other factors concerning functional limitations and restrictions due to pain or other symptoms," the ALJ made several observations relating to Plaintiff's credibility (*see infra*), some of which include that Plaintiff "contradicted herself when reporting having 10 seizures in one week, but then noted her medications controlled them" (Tr. 343) and Plaintiff's "Function Report does not support a deterioration or worsening, but rather shows [Plaintiff] responded favorably to treatment, [Plaintiff's] own internal contradictions further weakens her credibility and the veracity of her hearing statements" (Tr. 343). The ALJ further noted:

> While the record does reveal [Plaintiff] having difficulties with gait and motor strength on some examinations, the examiners indicated [Plaintiff] gave "poor effort," which tends to lessen the validation of such findings....
>
> ...the record does not support [Plaintiff] sustaining any injuries, or reporting any consistent complaints of pain or other subjective physical complaints....
>
> Specifically, multiple physicians have indicated that [Plaintiff] appeared to be exaggerated and her complaints here

characterized more subjectively, rather than objectively.

> Indeed, [Plaintiff] was diagnosed with undifferentiated somatoform disorder; however, the evidence also reveals [Plaintiff] appearing to have symptoms only at certain times, raising doubts as to her credibility. Particularly, during some visits at Hershey Medical, the examiners noted [Plaintiff] would shake her head from side to side, but would stop such shaking when distracted by the examiners. [Plaintiff] reported being unaware of such movements, but one examiner noted that the movement seemed "consciously driven," and the fact that such movements stopped when [Plaintiff] was distracted raises doubts as to whether or not [Plaintiff] is feigning such symptoms....
>
> Such evidence raises doubts as to the veracity and credibility of [Plaintiff's] physical and neurological symptoms.

(Tr. 340–41) (internal citations omitted).

The ALJ extensively discussed the material evidence throughout her decision and although all of the relevant evidence was not repeated in a specific credibility section, such is not required. *See Jones v. Barnhart,* 364 F.3d 501, 505 (3d Cir.2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis"); *see also Phillips v. Barnhart,* 91 Fed.Appx. 775, 780 n. 7 (3d Cir.2004); *Maxwell v. Colvin,* 1:13–CV–2410, 2015 WL 3409055, at *6–7 (M.D.Pa. May 27, 2015). Based on the foregoing, Plaintiff's argument fails and the ALJ sufficiently addressed the credibility factors. *See* SSR 96–7p; 20 C.F.R. §§ 404.1529, 416.929.

### 2. Conviction for Writing Bad Checks

Without citing any law, Plaintiff argues that Plaintiff's prior conviction for writing bad checks is not relevant to the

ALJ's credibility determination in Plaintiff's disability claim. Pl. Brief at 14. This argument is without merit.

■■■ "An ALJ may use 'ordinary techniques of credibility evaluation' in assessing a claimant's credibility" and such techniques include consideration of previous criminal convictions for crimes involving "an element of dishonesty." *Lisnichy v. Comm'r of Soc. Sec.*, 599 Fed.Appx. 427, 430 (3d Cir.) *cert. denied sub nom. Lisnichy v. Colvin*, — U.S. —, 135 S.Ct. 2325, 191 L.Ed.2d 990 (2015) (citing *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir.1996)); *see Hardisty v. Astrue*, 592 F.3d 1072, 1080 (9th Cir.2010) (affirming credibility determination based in part on claimant's criminal history); *Simmons v. Massanari*, 264 F.3d 751, 756 (8th Cir. 2001) (same); *Anthony v. Colvin*, No. 3:13–CV–02088, 2015 WL 3842979, at *11 (M.D.Pa. June 22, 2015) (affirming ALJ decision where ALJ determined that a crime involving dishonesty or a false statement raised credibility issues). A conviction for writing bad checks is a crime which requires proving a dishonest act or false statement. *Primrose v. Mellott*, No. CIV.A. 1:11–00835, 2012 WL 3890135, at *2–3 (M.D.Pa. Sept. 7, 2012). In this instance, the ALJ did not err in considering Plaintiff's criminal conviction along with other factors in her determination of Plaintiff's credibility. *See e.g., Lisnichy v. Comm'r of Soc. Sec.*, 599 Fed.Appx. 427, 430 (3d Cir.); *Anthony v. Colvin*, No. 3:13–CV–02088, 2015 WL 3842979, at *11.

Based on the foregoing, the Court finds no error in the ALJ's adverse inference from Plaintiff's prior conviction for writing bad checks.

### 3. Alleged Somatoform Related Symptoms

The credibility question in this case turns on evidence of Plaintiff's volition: Plaintiff's assertions that she has no control over the physical and psychological symptoms (which could be explained by a somatoform diagnosis) versus medical evidence indicating voluntarily feigning and symptoms. See DSM–IV–TR at 492 (requiring ruling out whether purported symptoms are intentionally produced or feigned); *see also Jackson–Farnsworth v. Colvin*, No. CIV.A. 12–2516–JWL, 2014 WL 1260122, at *8–9 (D.Kan. Mar. 27, 2014) ("The real question is whether the symptoms, or the severity or intensity of the symptoms are intentional or under voluntary control. If so, there may be the presence of a Factitious Disorder or Malingering and it would be appropriate to find that conversion disorder is not a medically determinable impairment or does not cause more than minimal limitations in Plaintiff's ability to perform basic mental work activities").

Substantial evidence supports the ALJ's determination that the objective medical evidence demonstrates a pattern of volition which makes Plaintiff less than credible. In support of her decision the ALJ observed:

> ...the objective record notes several occasions where [Plaintiff] gave poor effort, malingered and alleged excessive symptoms, which tends to question the extent to which her allegations are believable.

> During the neurological consultation ... [Plaintiff] made poor effort with muscle strength, and sensation was intact, although [Plaintiff] replied inconsistently mild questionable decreases in sensation to touch and pinprick areas on the left arm. [Tr. 848].

> ... examiners suspected diminished effort, and [Plaintiff] seemed to be able to control the subjective tremors/tricks in her neck, and during two separate examinations, her head began to shake

from side to side while she was conscious, and the examiners both noted the movement went away upon distraction. [Tr. 972, 975].

(Tr. 334–37).

The record supports the ALJ's findings of several instances where six different doctors (whose reports were reviewed and approved by six additional doc tors) on six different occasions observed indicia of Plaintiff intentionally feigning symptoms. (Tr. 812, 819, 840, 848, 971–72, 975). On January 26, 2011, Plaintiff saw Dr. Riggins who stated that it was difficult to completely evaluate Plaintiff because she "create[d] very poor effort" and noted that Plaintiff reported "inconsistantly [sic] mild questionable decrease in sensation to the touch, pinprick from the different areas on her left arm." (Tr. 848). On February 15, 2011, Dr. Todoric observed that the examination results "seem[ed] somewhat effort related." (Tr. 812). On February 16, 2011, Dr. Robert noted that during the examination, Plaintiff's "[g]rimace does not appear normal," however, questioned Plaintiff's effort. (Tr. 819). On February 6, 2011, Dr. Williams examined Plaintiff and observed:

> At one point, [Plaintiff] rang for nurse, then when nurse went into room, [Plaintiff] was unresponsive to voice with fluttering eyelids. I was called in, tried sternal rub with no change, then put tongue blade in to check for gag reflex. [Plaintiff] had intact gag and immediately after, woke up and said "What happened?" [Plaintiff] had 2 more self-limited episodes while [I] was here.

(Tr. 840). On April 9, 2011, Dr. Ermak observed that "[d]uring the examination, [Plaintiff] multiple times shakes her head side to side and says 'see here, it's staring again.' These movements last for seconds and then go away as I distract the patient. . . . These [symptoms] appear to be consciously driven." (Tr. 975). On April 13, 2011, Dr. Cortes observed that her head moved from side to side, but all examination findings were normal and the movement ceased when Plaintiff was distracted. (Tr. 971–72). The ALJ also observed that on July 11, 2011, Plaintiff sought her first psychiatric hospitalization, "although the examiners noted her previous documentation of conversion episodes at the Hershey Medical Center." (Tr. 338). This first psychiatric hospitalization (Tr. 1058) was shortly after the initial denial on June 21, 2011, which noted that Plaintiff never sought inpatient psychiatric treatment (Tr. 432).

Additionally, the expert medical opinions support the ALJ's findings. On June 7, 2011, Dr. Laguna observed that Plaintiff "certainly had [Cluster B] characteristics that came through on a number of occasions." (Tr. 959). "Cluster B traits," encompasses traits of antisocial, borderline, narcissistic and histrionic disorders, and histrionic disorder is characterized by "pervasive and excessive emotionality and attention-seeking behavior." *Supra* note 9. Contrary to Plaintiff's assertion that Dr. Laguna determined that Plaintiff suffered from "somatoform illness" (Pl. Brief at 16), Dr. Laguna stated that she had a "fixation on somatic complaints" (Tr. 953). Dr. Laguna did not did not conclude that Plaintiff met any somatoform DSM IV criteria in his diagnosis. (Tr. 960).

In June 2011, Dr. Fretz reviewed the record and completed a psychiatric review technique form and mental RFC assessment. (Tr. 429–31). Dr. Fretz reviewed the June 2011 opinion of Dr. Laguna, records from Philhaven Hospital received April 2011, Plaintiff's work history records, Plaintiff's function report, records from Hershey Medical Center received March 2011, records from Good Samaritan Hospital received March 2011, and a record that

states "Not Special Ed—No Record!," (Tr. 951) contradicting Plaintiff's assertion that she took special education courses throughout high school. (Tr. 427–28).

Although Dr. Fretz acknowledged that Plaintiff was discharged with a diagnosis of an undifferentiated somatoform disorder, Dr. Fretz opined that Plaintiff's medically determinable illnesses were only affective disorders under impairment code 2960 (Listing 12.04) and anxiety disorders under impairment code 3000 (Listing 12.06). (Tr. 429). Dr. Fretz did not write impairment code 3060 (Listing 12.07) to endorse a somatoform disorder as a medically determinable illness. (Tr. 429).

Dr. Fretz interpreted Plaintiff's examination with Dr. Laguna as demonstrating that Plaintiff "was not fully cooperative," that Dr. Laguna "indicated his impression that she was overstating her level of dysfunction," and indicated that her reported level of dysfunction was not supported by the evidence. (Tr. 432). After considering the total medical and non-medical evidence in the file, Dr. Fretz found Plaintiff to be partially credible. (Tr. 430, 441).

Plaintiff argues that substantial evidence does not support the ALJ's discrediting Plaintiff's syncopal episodes. Pl. Brief at 12–13. Plaintiff argues that the "only basis" the ALJ gave for not believing Plaintiff's syncopal episodes is "that '[Plaintiff's] allegation of numerous falls without ever hurting herself [is] exaggerated and not credible.'" Pl. Brief at 12. As explained above, there are other reasons that the ALJ cited which adversely impact Plaintiff's credibility. In view of the evidence in totality, substantial evidence supports the ALJ's discrediting of Plaintiff's syncopal episodes.

Contrary to Plaintiff assertion that the medical record demonstrates that Plaintiff had injured herself on one occasion during a syncopal episode (Pl. Brief at 13 (citing to Tr. 860)), the record indicates that Plaintiff reported only the subjective symptom of neck pain. (Tr. 860). The record supports the ALJ that there is no evidence of objective indicia of falls such as contusions. Tr. 865–66 (Drs. Coffey and Kimak noted no evidence of acute injury); Tr. 859, 879, 880 (Dr. Kaplan observed no evidence of mediastinal injury, no local contusions (bruising)); Tr. 984 (Drs. Nickless and O'Neill noting no associated injuries with a recent syncopal episode); Tr. 1081 (intake form indicating Plaintiff had "rash and/or itching skin," however, did not indicate the box for bruising). Plaintiff is correct that Plaintiff testified that she "does not immediately 'pass out' when she has an episode" and "therefore it possible that she will be able to get herself into a position where she will not injure herself before she falls." (Pl. Brief at 13). However, as discussed above, credibility is determined in totality of the evidence. The ALJ's interpretation of the lack of objective indicia of injury due to the many alleged falls is reasonable in the context of the evidence in totality which supports the ALJ's adverse credibility finding. Nevertheless, even if the Court were to find error in the ALJ's inference from the lack of objective indicia of injury, such finding is harmless and would not change the outcome of the case.

Based on the foregoing, the ALJ's adverse credibility determination is supported by substantial evidence.

### 4. Mischaracterization of Doctors' Conclusions

Plaintiff also argues that the ALJ has "mischaracterized the findings of the different doctors in this case." Plaintiff correctly points out that the ALJ erroneously stated that doctors explicitly determined that Plaintiff was a malingerer, rather, they concluded that malingering was a

possible diagnosis to rule out upon further investigation. *See e.g.*, (Tr. 813). As discussed above, a malingering diagnosis by a doctor is not necessary for the ALJ to determine that Plaintiff was not credible.

Moreover, the Court in *Williams v. Barnhart*, upheld an ALJ decision where although "[s]ome of the discrepancies pointed out in the ALJ's opinion are not great and might not alone support an adverse credibility determination," other record evidence, supported the ALJ's finding of incredibility. *Williams v. Barnhart*, 87 Fed.Appx. 240, 243–44 (3d Cir.2004).

"Considering cumulatively the inconsistencies and the other relevant record evidence, we conclude that substantial evidence supports the ALJ's adverse credibility finding." *Williams v. Barnhart*, 87 Fed.Appx. 240, 243–44 (3d Cir. 2004). *See also Napoli v. Colvin*, No. 3:13–CV–01815, 2014 WL 2808603, at *11 at n. 23 (M.D.Pa. June 20, 2014) (finding harmless error harmless error under the totality of the evidence); *Bivins ex rel. N.B. v. Astrue*, No. 5:11–CV–51 MSH, 2011 WL 5859954, at *5 (M.D.Ga. Nov. 22, 2011) ("Considering the totality of the medical evidence, the ALJ's erroneous reference to a statement ... is harmless.... A remand to have the ALJ perfect the record as to this statement would serve no practical purpose, would not alter the ALJ's findings, and would be a waste of judicial and administrative resources"); *Rahman v. Astrue*, No. 1:11–CV–3094–JSA, 2012 WL 5507314, at *12 (N.D.Ga. Nov. 14, 2012) (finding harmless record where the ALJ discredited a plaintiff's testimony "on a number of valid grounds").

In light of the totality of the evidence and the ALJ's extensive review of the record, the ALJ's mischaracterization of the record to indicate that different doctors explicitly stated the Plaintiff was a malingerer amounts to harmless error.

#### 5. Crack–Cocaine Testimony

Plaintiff argues that the ALJ erred in determining that Plaintiff was not credible because she had previously used crack cocaine and stated that she had quit "cold turkey" without the aid of any substance abuse treatment programs. Pl. Brief at 13–14. The ALJ wrote:

> [Plaintiff] at first reported she never used illegal drugs, but she then reported past crack cocaine abuse and that she last used five years ago. She stated she never attended AA or NA and stopped by going "cold turkey." [Plaintiff] testified she was arrested for writing bad checks, and was placed on probation for a year. I find her testimony regarding her drug abuse and ability to quit cold turkey despite the addictive nature of her drugs of choice implausible. Furthermore, her conviction supports my finding that she is less than honest.

Tr. 333. In the record, Plaintiff indicated that she smoked crack cocaine daily from 2000 to 2004, spending a maximum of $1000, and ultimately "stopped cold." (Tr. 1059, 1067, 1071, 1074, 1096, 1234).

"Evidence can be used to discount credibility if such evidence demonstrates a contradiction or inconsistency." *Gleason v. Colvin*, No. 3:14–CV–00021–GBC, 152 F.Supp.3d 364, 380–81, 2015 WL 4232569, at *13–14 (M.D.Pa. July 13, 2015) (finding ALJ erred in concluding that Plaintiff's uncontradicted statement in the functional report that her twelve-year-old son helped her with activities of daily living was not credible).

Contrary to the opinion that the addictive nature of crack cocaine is one that makes it impossible for an individual to stop without the aid of any programs or suffering any relapses, there is evidence to suggest otherwise. *See e.g.*, Shima Bara-

daran, *Drugs and Violence*, 88 S. Cal. L.Rev. 227, 286 (2015) ("There is . . . data showing that crack cocaine and even methamphetamines are not as addictive as once believed, as 80 to 90 percent of people who use these drugs do not become addicted."); United States President's Commission on Organized Crime, *America's habit: drug abuse, drug trafficking, and organized crime, report to the President and the Attorney General*, at p. 16 (1986) (stating that 25 million Americans have tried cocaine, five to six million people use it a least once a month, and almost half of the regular users may be considered addicted); A. Morgan Cloud, III, *Cocaine, Demand, and Addiction: A Study of the Possible Convergence of Rational Theory and National Policy*, 42 Vand. L.Rev. 725, 756 (1989) (describing a study of cocaine use over time which "classified cocaine users either as social-recreational users (one gram per week), as circumstantial-situation users (two grams per week), as intensified users (three grams per week), or as compulsive users." The latter two groups comprised approximately ten percent of the study population).[18] In this instance, the ALJ erred in drawing an adverse inference from Plaintiff's uncontradicted testimony that she quit smoking crack "cold turkey" solely based on the ALJ's mere speculation. *See Gleason v. Colvin*, No. 3:14–CV–00021–GBC, 152 F.Supp.3d 364, 380–81, 2015 WL 4232569, at *13–14 (M.D.Pa. July 13, 2015).

However, the Court notes that the ALJ also observed that Plaintiff initially lied about past illegal drug use. (Tr. 333). Also, as discussed above, the totality of the evidence supports the ALJ's adverse credibility finding, and as such, the ALJ's adverse inference from Plaintiff stopping crack "cold turkey" amounts to harmless error.[19] *See e.g., Williams v. Barnhart*, 87 Fed.Appx. 240, 243–44 (3d Cir.2004).

## C. Listings

Plaintiff argues that the ALJ erred in not concluding that Plaintiff's impairments met the requirements of Listings 12.04 and 12.07. Pl. Brief at 16–21.

A claimant must establish each element of a Listing to meet a Listing. 20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies *all of the criteria in the listing*.") (emphasis added). As the Third Circuit has explained:

> For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 110 S.Ct. at 891 (emphasis in original). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar

---

**18.** Professor Cloud also noted that:

> [p]hysical dependence alone cannot explain the phenomenon of addiction. For example, studies of American servicemen who became addicted to heroin while serving in Vietnam report that a substantial percentage of this group voluntarily discontinued the use of heroin and did not continue as practicing addicts after returning to the United States.

A. Morgan Cloud, III, *Cocaine, Demand, and Addiction: A Study of the Possible Convergence of Rational Theory and National Policy*, 42 Vand. L.Rev. 725, 818 at n. 49 (1989)

**19.** The Court notes that Third Circuit has not extended the "cumulative error doctrine" to civil trials, let alone to the review of administrative decisions. *Burnside v. Colvin*, No. 3:13–CV–2554, 2015 WL 268791, at *14 (M.D.Pa. Jan. 21, 2015).

listed impairment." *Id.* (emphasis in original).

*Williams v. Sullivan,* 970 F.2d 1178, 1186 (3d Cir.1992). Thus, if there is one element that is not satisfied, the ALJ will have substantial evidence to conclude that a claimant does not meet a Listing. *See Williams v. Sullivan,* 970 F.2d 1178, 1186.

Plaintiff correctly points out that the ALJ's credibility determination affects whether Plaintiff meets a listing "due to her repeated emergency room visits not being analyzed as counting towards episodes of decompensation." Pl. brief at 16. Given the Court finds that the ALJ's credibility determination to be supported by substantial evidence, it follows that the ALJ's determination that Plaintiff's repeated emergency room visits do not count as episodes of decompensation. Thus, Plaintiff does not meet the requirements of section 12.07(B)(4) or subsections (B)(4) and (C)(1) of section 12.04 requiring "[r]epeated episodes of decompensation, each of extended duration." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.07(B)(4), 12.04(B)(4), (C)(1). Moreover, as will be discussed below, it was reasonable for the ALJ to rely on the expert opinions of Drs. Laguna and Fretz in concluding that Plaintiff did not suffer impairments which result in marked restrictions of daily living, marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace and thus would preclude a finding of a Listing under 12.07(B)(1) through (3) and a Listing under 12.04(B)(1) through (3) or (C). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.07(B)(1) through (3), 12.04(B)(1) through (3), (C).

### D. Weight Accorded to Medical Opinions and Residual Functional Capacity

Plaintiff argues that the RFC is not supported by substantial evidence because "the ALJ failed to include limitations related to [Plaintiff's] Somatoform Disorder." Pl. Brief at 21. Plaintiff continues:

> Ms. Yevtukh examination shows that [Plaintiff] was suffering from malaise, neck pain, joint pain, muscle pain, and decreased range of motion. (Tr. 1316). She was also suffering from moderate radiating pain in her back. (Tr. 1316). [Plaintiff] had an unsteady gait, was not coordinated and was not able to balance on her left leg or right leg. (Tr. 1316). Ms. Yevtukh, completed a residual functional capacity questionnaire. (Tr. 1245—1249). In the questionnaire, Ms. Yevtukh stated that [Plaintiff's] physical symptoms include dizziness, unstable gait, syncope, and fatigue. (Tr. 1245). Ms. Yevtukh ... stated that depression, somatoform disorder, and anxiety affect [Plaintiff's]s physical condition. (Tr. 1245-1246). The RFC failed to take into account these physical problems which are documented by examination. The RFC also failed to take into account [Plaintiff's] repeated syncope episodes which would affect her ability to maintain concentration, persistence, and pace.

Pl. Brief at 21–22. Essentially, Plaintiff argues that the ALJ erred by not according the opinion of Ms. Yevtukh, a certified registered nurse practitioner (CRNP), any weight. *See* Pl. Brief at 21–22. It appears that Plaintiff is arguing that the opinion of Ms. Yevtukh should have been accorded controlling weight over the opinions of Drs. Laguna and Fretz. *See* Pl. Brief at 21–22.

"Medical opinions are statements from ... *acceptable medical sources* that reflect judgments about the nature and severity of [a claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or

mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (emphasis added). Only licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are considered "acceptable medical sources." *See* 20 C.F.R. §§ 404.1513(a) & 416.913(a). Evidence from "other sources" that are not "acceptable medical sources" and are not entitled controlling weight. *See* 20 C.F.R. §§ 404.1513(a) and (d)(1), 404.1527(a)(2), 416.913(a) and (d)(1), 416.927(a)(2); Social Security Ruling (SSR) 96–2p (rule for according controlling weight to "treating source medical opinions"); SSR 06–03p; *Hartranft v. Apfel,* 181 F.3d 358, 361 (3d Cir.1999); *cf. Gomez v. Chater,* 74 F.3d 967, 970–71 (9th Cir.1996) (Opinions from "other sources" can be accorded "less weight than opinions from acceptable medical sources").

Nurse practitioners are not acceptable medical sources. (*See* 20 C.F.R. §§ 404.1513(a), (d)(1) and 416.913(a), (d)(1)). Nevertheless, opinions from other medical sources should be considered by the ALJ in its overall findings, specifically with respect to issues such as the severity of impairments and functional effects. *See* 20 C.F.R. 404.1527(b) and 416.927(b); *Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 121–23 (3d Cir.2000); SSR 06–03p ("The term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources' "). Although "other source" opinions can, under certain limited circumstances, outweigh the opinion from a medical source, the ALJ need only consider evidence from such other sources with the available evidence as a whole. *See* 20 C.F.R. 404.1527(b) and 416.927(b); SSR 06–03p.

An ALJ may properly allocate greater weight to the consultative opinion of a non-examining physician who reviews a claimant's medical records than non-acceptable medical sources, provided that the ALJ adequately explains the grounds for this determination. *See e.g., Hartranft v. Apfel,* 181 F.3d 358, 361 (3d Cir.1999); *Gomez v. Chater,* 74 F.3d 967, 970–71 (9th Cir.1996).

The ALJ extensively reviewed the record and considered all the credibility factors in totality of the evidence. (Tr. 332–343). With respect to her determination of Plaintiff's RFC, the ALJ concluded that Plaintiff could:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] can understand, remember and carry out simple, routine and repetitive tasks at a low stress job with no strict production rate requirements with occasional interaction with the public and co-workers.

Tr. 331. Substantial evidence supports the ALJ's RFC as the ALJ considered all the evidence of record, properly supported her allocations of weight to the opinion evidence, and reasonably relied on the opinion evidence in formulating Plaintiff's RFC. In this instance, the ALJ accorded "great weight" to the opinion of Dr. Fretz (Tr. 343), "some weight" to the opinion of Dr. Laguna (Tr. 341), and "no weight" to the opinion of Ms. Yevtukh (Tr. 342).

For the lack of weight given to the opinion of Ms. Yevtukh, the ALJ explained:

> [Ms.] Yevtukh's opinion [is] inconsistent with the objective evidence, and in light of the limited physical findings ... the limitations in her opinion [are] excessive. Additionally, Ms. Yevtukh noted she [was] not a neurologist nor [did] she treat [Plaintiff]'s depression, further weakens the persuasiveness of her opin-

ion .... her opinion is not consistent with the relatively normal findings, even those seen on Ms. Yevtukh's own examinations.

(Tr. 343). The record supports the ALJ's conclusions regarding Ms. Yevtukh's opinion.

In the April 2012 opinion, Ms. Yevtukh indicated that she has seen Plaintiff every six months for the last two years and that Plaintiff's diagnoses included dizziness and visual disturbance, which she also included with Plaintiff's symptoms of unstable gait and fatigue. (Tr. 1245). Ms. Yevtukh gave no opinion regarding her prognosis, noting, "I am not a neurologist," (Tr. 1245) and in response to the question of whether Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation, Ms. Yevtukh indicated "no" and explained, "I do not manage her depression" (Tr. 1246). Without further explanation, Ms. Yevtukh indicated that Plaintiff was incapable of "low stress" jobs. (Tr. 1246). Ms. Yevtukh also indicated that Plaintiff requires the occasional use of a cane and she had various postural and upper extremity limitations. (Tr. 1246–48).

There is no evidence in the record to support Ms. Yevtukh's findings that Plaintiff needs any ambulatory aid and, on various occasions, Plaintiff had been observed with a normal gait. On April 14, 2011, Dr. Subramanian recorded completely normal findings, including normal gait. (Tr. 969). On July 11, 2011, on the admission "fall risk" intake form of Philhaven, a registered nurse indicated that Plaintiff did not need any ambulatory aid and her gait was normal. (Tr. 1099). On April 9, 2012, while at Philhaven, Plaintiff underwent a physical exam and extremities, range of motion, gait, and motor functions were all normal. (Tr. 124142). However, on the day of Ms. Yevtuck's evaluation, on April

24, 2012, it was observed that Plaintiff had an unsteady gait, was not coordinated, and was not able to balance on her left leg or right leg. (Tr. 1316).

As noted above, the ALJ stated that given the records indicating voluntariness of Plaintiff's symptoms, she found such "raise[d] doubts as to the veracity and credibility of [Plaintiff]'s physical and neurological symptoms" (Tr. 340–41), a finding that is supported by substantial evidence. *See supra.* Moreover, the ALJ properly allocated greater weight to the consultative opinion of Dr. Fretz and adequately explained the grounds for giving Dr. Fretz's opinion great weight. *See Hartranft v. Apfel,* 181 F.3d 358, 361 (3d Cir. 1999). As reasons for giving great weight to the opinion of Dr. Fretz, the ALJ explained:

> Dr. Fretz, opined [Plaintiff] can understand, remember and carry out simple tasks. (Exhibit 2A). This is consistent with the medical records from Dr. Laguna, Philhaven Hospital, Hershey Medical Center and Good Samaritan Hospital, which all reveal [Plaintiff] having depression and anxiety, and related symptoms, that would reasonably limit [Plaintiff]'s ability to carry out more detailed tasks and instructions. (*See generally* Exhibits 2F; 3F; 4F; 6F; 8F–12F; 13F; 16F; 17F). Moreover, Dr. Fretz's opinion is based on his specialty in mental health and his familiarity with the Social Security Administration disability program. His opinion reasonably comports with the evidence contained in the record at the time of the assessment, and evidence received at the hearing level did not demonstrated a worsening or deterioration in [Plaintiff]'s condition requiring more restrictive limitations. (*Id.*).

Tr. 343. Based on the Court's above credibility analysis, the Court finds that the

ALJ did not err in deciding not to include in the RFC physical symptoms where substantial evidence supported that such physical symptoms were intentionally feigned. The Court finds that the ALJ's reliance on Dr. Fretz's opinion in support of Plaintiff's RFC was proper. Based on the foregoing, the ALJ's allocation of weight to medical opinions and RFC are supported by substantial evidence.

## V. Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown,* 845 F.2d at 1213; *Johnson,* 529 F.3d at 200; *Pierce,* 487 U.S. at 552, 108 S.Ct. 2541; *Hartranft,* 181 F.3d at 360; *Plummer,* 186 F.3d at 427; *Jones,* 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.,* 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I. This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II. The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 7, 2015